UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | Criminal Case No. 3:14-30044-MGM |
| | ) | |
| SYED BOKHARI, | ) | |
| Defendant | ) | |

<u>MEMORANDUM AND ORDER REGARDING DEFENDANT'S MOTION FOR ORDER
RELEASING SEIZED FUNDS NECESSARY FOR LEGAL DEFENSE</u>
<u>(Dkt. No. 27)</u>

I.    <span style="font-variant:small-caps">Introduction</span>

Defendant Syed Bokhari ("Defendant") is charged in a thirty-two count indictment with

conspiracy to commit wire fraud (count one) and specific acts of wire fraud (counts two through

eleven); aiding and abetting contraband smokeless tobacco trafficking (counts twelve through

sixteen); conspiracy to commit money laundering (count seventeen) and specific acts of money

laundering in violation of 18 U.S.C. § 1956(a)(1)(B)(i) and 2 (counts eighteen through twenty-

two); money laundering in violation of 18 U.S.C. § 1957 and 2 (counts twenty-three through

twenty-seven); and violation of the PACT (Prevent All Cigarette Trafficking) Act (counts

twenty-eight through thirty-two) (Dkt. No. 2).  The indictment includes forfeiture allegations

pursuant to 18 U.S.C. §§ 981 and 982 and 28 U.S.C. § 2461.  On or about June 5, 2012, the

government executed warrants issued by this court authorizing the seizure of, among other

things, tobacco products stored in a warehouse in Scranton, Pennsylvania ("Scranton Tobacco").

The warehouse in Scranton was the base of operations of Cigar & Supplies, Inc. ("C&S"), a

business that was wholly owned by Defendant.  By agreement of the parties, after seizure, the

Scranton Tobacco was sold at auction, netting $1,015,523.48 ("Tobacco Funds") (Dkt. No. 84 at

7).

The Defendant's Motion for Release of Funds Necessary for Legal Defense ("Defendant's Motion"), seeking release of at least $750,000 of the Tobacco Funds for purposes of funding his defense (Dkt. No. 27), was referred to the undersigned for hearing and decision (Dkt. No. 49). Defense counsel has entered a limited appearance in this case pending a ruling on Defendant's Motion (Dkt. No. 40). The court held a series of hearings in connection with Defendant's Motion, including an evidentiary hearing, and received pre- and post-hearing submissions from the parties. The court hereby issues its findings of fact and rulings of law, and, for the reasons set forth below, DENIES Defendant's Motion.

II.     Procedural background

On June 5 and 8, 2012, pursuant to search and seizure warrants issued by this court, the government seized assets of Defendant, including bank accounts, motor vehicles, cash, and the Scranton Tobacco (Dkt. No. 98 at 1). On October 1, 2012, the government filed a civil forfeiture proceeding for possession of the seized assets (Case # 3:12-cv-30167-RWZ). In November 2013, after certain assets had been returned to Defendant, the parties entered into a settlement agreement in the civil forfeiture case, which provided, *inter alia*, that the United States would retain custody of the Scranton Tobacco unless the parties agreed to the forfeiture or release of the Scranton Tobacco or the United States filed an indictment that included the Scranton Tobacco as forfeitable, in which case the parties agreed that the United States would retain custody of the Scranton Tobacco until final adjudication of the criminal case, or until such time as "an order for the return of some or all of the Scranton Tobacco prior to the final adjudication of the criminal case was entered by the District Court presiding over such criminal case" (Dkt. No. 279-1 at 13, Docket for Case # 3:12-cv-30167-RWZ).

Defendant was indicted on October 16, 2014.  The indictment included the Scranton Tobacco as forfeitable property.  Defendant's Motion was filed on November 24, 2014.  On December 19, 2014, Defendant moved for leave to file an affidavit addressing the extent of his financial resources – and his concomitant ability to retain his counsel of choice – *ex parte* and under seal.  After briefing and argument by the parties, on February 12, 2015, the court allowed Defendant's motion to file financial information *ex parte*, subject to the condition that the Government also could file an *ex parte* submission addressing Defendant's financial resources (Dkt. No. 60).  Both sides availed themselves of the opportunity to file *ex parte* submissions, and, following a review of those submissions, the court allowed so much of Defendant's Motion as sought an evidentiary hearing on the question of the Government's right to a continuing pre-trial restrain on assets Defendant claims he needs to retain his counsel of choice (Dkt. No. 73).

The evidentiary hearing was held on March 26, 2015, after which the parties filed post-hearing memoranda including proposed findings of fact and rulings of law (Dkt. Nos. 88, 96, 97, 104, 109).  After carefully considering all of the evidence before it, the court makes the following findings of fact and rulings of law.

III.   RELEVANT FACTS

In *Kaley v. United States*, 134 S.Ct. 1090 (2014), the Court held that an indicted defendant claiming to need access to funds restrained by the government for purposes of retaining defense counsel was not entitled to re-litigate the grand jury's finding of probable cause to believe that the defendant committed the offenses charged in the indictment.  *See id.* at 1100. The government argues, and Defendant has not disputed, that the factual allegations in the indictment that support the grand jury's findings of probable cause to believe that Defendant committed the offenses as charged must be treated as established for purposes of Defendant's

Motion (Dkt. No. 84 at 5-6).  Accordingly, the government submitted the indictment as an exhibit at the evidentiary hearing, and its allegations form part of the basis of the court's factual findings (Exhibit ("Exh.") 1; Dkt. No. 2).[1]  The allegations in the indictment are critical for another reason:  because the government must show the requisite nexus between the specific property as to which it seeks forfeiture – the Scranton Tobacco – and the crimes charged in the indictment, the indictment, in essence, serves as a limitation on the assets that are subject to forfeiture.  *See generally United States v. Capoccia*, 503 F.3d 103 (2d Cir. 2007).

    A.  Defendant's business and alleged criminal conduct

    Beginning in or around 2005, Defendant owned C&S, a wholesale business that sold smokeless tobacco and cigars and operated out of a warehouse in Scranton, Pennsylvania (Dkt. No. 2 at 1).  From 2001 through January 2012, Defendant was the de facto owner of a wholesale business that operated out of a warehouse in Springfield, Massachusetts selling tobacco products to convenience stores, gas stations and other retail outlets, and, beginning in or around 2011, he became the de facto owner of a similar business that operated out of a warehouse in Danbury, Connecticut (*id.* at 2-3).

    C&S sold over ninety percent (90%) of the tobacco products that it purchased from wholesale suppliers and manufacturers to business entities operating out of five warehouses, including the warehouses in Springfield and Danbury (Exh. 17; Hearing Transcript ("Hrg. Trans.") at 65).[2]  Approximately forty-three percent (43%) of the C&S tobacco products were shipped to the Danbury and Springfield warehouses (Exh. 17).  In Massachusetts and Connecticut, wholesale businesses selling cigars and smokeless tobacco must pay excise tax on

---

[1] References to exhibits are to documents introduced as exhibits at the March 26, 2015 evidentiary hearing.  The government's exhibits are identified numerically; Defendant's exhibits are identified alphabetically.

[2] References to the hearing transcript are to the transcript of the evidentiary hearing, filed by the government as Docket Number 97-2.

their product (Dkt. No. 2 at 3-4).  From at least 2008 through June 5, 2012, Defendant engaged

in a conspiracy with others to deprive Massachusetts and Connecticut of tax revenue on sales of

tobacco products (*id*. at 5).  To accomplish the goals of the conspiracy, Defendant (with others)

would ship tobacco products from the Scranton warehouse to the warehouses in Springfield and

Danbury without reporting these shipments to the authorities in Connecticut or Massachusetts

(*id*. at 6).  To avoid creating records of sales transactions, Defendant, with others, arranged that

sales of tobacco products by the Springfield and Danbury warehouses to convenience stores, gas

stations and other retailers would primarily be for cash (*id.* at 6, 20; Exh. 24 at 7; Hrg. Trans. at

62).  Defendant directed that deceptive financial records be prepared for purposes of filing false

tax returns with the Massachusetts and Connecticut taxing authorities, and he caused false tax

returns to be filed in Massachusetts and Connecticut (Dkt. No. 2 at 9-13).

Cash generated by the sale of tobacco products by the Springfield and Danbury

warehouses was deposited into bank accounts of C&S, brought to Defendant's offices, or

deposited into bank accounts of the Defendant, or the Hawthorn Inn and the Litchfield on the

Green Inn, two businesses owned by Defendant (*id*. at 20-21).  Defendant also would arrange for

the transfer of funds from the C&S bank accounts to his personal bank accounts and to the bank

accounts of other businesses unrelated to the purchase and sale of tobacco products (*id*. at 21).

Defendant intended this arrangement of cash transfers and bank deposits to conceal the origin,

ownership and control of the funds collected by C&S for the sales of tobacco products by the

Springfield and Danbury warehouses.  Transactions were predominantly in cash to conceal the

source and amounts of the monies generated by the C&S sales of tobacco products that were

made in furtherance of the tax avoidance scheme (*id*.).

B.  C&S tobacco purchases

5

C&S used the majority of the payments it received from the Springfield and Danbury warehouses and the other three warehouses that were its sub-distributors to purchase additional tobacco products from wholesale suppliers and manufacturers (Exh. 3 at 39; Exh. 24 at 7-8; Hrg. Trans. at 69, 94).  Exhibits at the hearing showed that approximately forty percent (40%) of the tobacco products purchased by C&S were purchased on credit from Harold Levinson and Associates ("HLA") (Exhs. 45, 46).  C&S was an important customer for HLA, typically purchasing close to $700,000 worth of product each week (Exh. 44 at 47).  C&S owed HLA approximately $2,000,000 on June 5, 2012, when the Scranton warehouse was raided and the Scranton Tobacco seized (*id*. at 41).  C&S's other suppliers generally required payments via electronic fund transfers or check either before or within a few days of the products arriving at the Scranton warehouse (Exhs. 43, 46).  Because of their perishable nature, almost all of the tobacco products purchased by C&S were distributed within two weeks of being received at the Scranton warehouse (Exh. 45).

Had the government not served search and seizure warrants on June 5, 2012, thereby bringing an end to C&S as a functioning enterprise, Defendant would have paid his suppliers for the tobacco products that were seized and would have continued operating C&S (Exh. 24 at 27, 42).

C.  Seizure and Auction of Scranton Tobacco

The government seized the Scranton Tobacco on June 5, 2012.  C&S did not organize its stored tobacco products by supplier, and the product generally consisted of items that could have been ordered from a number of manufacturers or wholesalers (Dkt. No. 98-1).  Agents placed the seized tobacco products on 147 pallets.  Agents could not have, and did not, segregate the products by supplier on these pallets (*id*.).  In compliance with an agreement for interlocutory

sale between the government and Defendant, the Scranton Tobacco was sold at auction (Dkt. No.

98-3).  Because the Scranton Tobacco was perishable property and was incurring storage costs,

the parties agreed that its sale provided the best means of preserving its value (*id*.).  The 147

pallets of tobacco products yielded $1,015, 523.48 after sales expenses (Dkt. No. 96 at 7, Exhs.

41, 42).  The defendant contends that the value of the Scranton Tobacco was well over

$2,000,000 when it was seized (Dkt. No. 96 at 7; Exh. 24 at 26), and the government does not

dispute this claim.

      D.    <u>Quantification</u>

As of June 5, 2012, C&S had paid for some portion of the Scranton Tobacco.  Some

portion of the Scranton Tobacco (primarily products from HLA) had been furnished to C&S on

credit and had not yet been paid for at the time of seizure.  The parties dispute what portion of

the Scranton Tobacco had been paid for as of June 5, 2012.  The government contends that, using

one of two methods to allocate the Tobacco Funds between tobacco products that had been

obtained by C&S on credit and those that C&S had paid for, it can reasonably be found, at least

on a preliminary basis, either that: (1) approximately forty-seven percent (47%) of the tobacco

products in the Scranton warehouse on June 5, 2012 had been supplied on credit and had not

been paid for at the time of seizure; or (2) approximately thirty-five percent (35%) of the

products had been supplied on credit and had not been paid for at the time of seizure (Dkt. No.

98 at 1-6).  For his part, Defendant contends, on information and belief, that at least $787,152.00

of the funds paid for the Scranton Tobacco at auction were for product that had not been paid for

as of the date of seizure.  Defendant arrived at this figure by personally reviewing documents,

including the government's sales summary sheet and C&S business records, and employing his

personal knowledge and recollection of the products that were in the Scranton warehouse on June 5, 2012 (Dkt. Nos. 96, 96-1).

IV.     CONCLUSIONS OF LAW

Section 853(e) of Title 21 of the United States Code authorizes a court, on application of the government, to restrain a defendant's assets pre-trial if those assets would be subject to forfeiture upon the defendant's conviction.  *See Kaley*, 134 S.Ct. at 1094.  *See also* 21 U.S.C. § 853(f) (government may apply for warrant authorizing pre-trial seizure of property subject to forfeiture).  The United States Supreme Court has acknowledged the vital interest a criminal defendant has in retaining the attorney that the defendant believes will provide the best possible defense.  *See Kaley*, 134 S.Ct. at 1102-1103.  Indeed, the Court has stated that the ability to secure counsel of choice is at the root of the right to counsel protected by the Sixth Amendment. *See United States v. Gonzalez-Lopez*, 548 U.S. 140, 147-148 (2006); *see also United States v. Jones*, 160 F.3d 641, 645 (10th Cir. 1998) (selection of one attorney over another can profoundly affect outcome of trial).  Nonetheless, the Court has repeatedly held that, as long as there is probable cause to believe that assets seized from a defendant would be subject to forfeiture on conviction, the government is entitled to restrain those assets pre-trial even when, as here, "the defendant seeks to use the disputed property to pay for a lawyer."  *Kaley,* 134 S.Ct. at 1094 (citing *United States v. Monsanto*, 491 U.S. 600, 615 (1989)); *see also Caplin v. Drysdale, Chartered v. United States*, 491 U.S. 617 (1989).

1.  Standard of review

In a series of decisions beginning with the panel opinion in *United States v. Monsanto*, 836 F.2d 74 (2d Cir. 1987) (*vacated and remanded on hearing en banc*, 852 F.2d 1400 (2d Cir. 1988), *rev'd*, 491 U.S. 600 (1989)), the United States Court of Appeals for the Second Circuit

held that due process concerns require that a defendant have the opportunity for a "post-indictment, pre-trial adversarial hearing on the restraint issue" when the defendant seeks access to funds to retain counsel of choice. *United States v. Monsanto,* 924 F.2d 1186, 1195 (2d Cir. 1991), *abrogated in part*, 134 S.Ct. 1090 (2014). Following the Second Circuit's rulings, such hearings are often referred to as *Monsanto* hearings. *See United States v. Emor*, 794 F. Supp. 2d 143, 148 (D.D.C. 2011). In *Kaley,* the Supreme Court observed that, following its decision in *Monsanto,* the lower courts generally have agreed with the Second Circuit in providing a hearing to a defendant seeking to lift a pre-trial asset restraint for purposes of retaining counsel of choice. *See Kaley*, 134 S.Ct. at 1095.

The United States Court of Appeals for the First Circuit has not yet addressed the question of when, if ever, and on what showing a criminal defendant is entitled to a hearing concerning a pre-trial challenge to an asset restraint, nor has the court had occasion to address the parties' respective burdens of proof if any such hearing is held. Other circuit courts of appeals have considered and addressed these issues. A majority of these courts have required a defendant seeking to lift a pre-trial asset restraint to make a threshold showing of financial need to obtain a so-called *Monsanto* hearing. *See, e.g.*, *United States v. Bonventre*, 720 F.3d 126, 129-132 (2d Cir. 2013) (to obtain *Monsanto* hearing, defendant must make sufficient threshold evidentiary showing that he or she does not have alternative unrestrained assets to fund counsel of choice); *United States v. Holy Land Found. for Relief & Dev.*, 493 F.3d 469, 475 (5th Cir. 2007) (en banc) (pre-trial hearing may be required when defendant claims need for restrained assets to pay counsel or cover ordinary living expenses); *Jones*, 160 F.3d at 647 (defendant entitled to hearing when defendant demonstrates to court's satisfaction that there are no assets other than those restrained to pay counsel and daily living expenses). In the instant case, relying

on these and other authorities, and in view of the importance of Defendant's right to counsel of

choice, *see Bonventre,* 720 F.3d at 131, the court concluded that Defendant had made a sufficient

threshold showing of financial need to warrant holding a *Monsanto* hearing (Dkt. No. 73).

      If a defendant makes the requisite financial showing and a hearing is held, while there is

not a consensus, a majority of the circuit courts have placed a burden on the government to

justify maintaining a pre-trial restraint of contested assets.  Thus, the Second Circuit, in

*Bonventre*, held that, at a *Monsanto* hearing, "the government will bear the relatively modest

burden of demonstrating probable cause to believe the assets are properly forfeitable."

*Bonventre*, 720 F.3d at 131; *see also Monsanto*, 924 F.2d at 1196.  Courts in other circuits also

have imposed on the government the burden of showing probable cause to believe that the assets

are forfeitable under the controlling law.  *See United States v. E-Gold, Ltd.*, 521 F.3d 411, 419

(D.C. Cir. 2008), *abrogated in part*, 134 S.Ct. 1090 (2014) (at *Monsanto* hearing, district court

would need only to require government to establish probable cause as to the forfeitability of the

specified assets); *United States v. Melrose East Subdivision*, 357 F.3d 493, 503-504, 505 (5th

Cir. 2004) (aligning government's burden of showing probable cause to maintain restraining

order in civil case with burden of showing probable cause at due process hearing challenging

pre-trial restraint of assets for criminal forfeiture; defining probable cause as "'a reasonable

ground for belief . . . supported by less than prima facie proof but more than mere suspicion'"

(quoting *1988 Oldsmobile Cutlass Supreme 2 Door*, 983 F.2d 670, 674 (5th Cir. 1993)); *Jones*,

160 F.3d at 647 (at adversarial hearing, government "must establish probable cause to believe

that the restrained assets are traceable to the underlying offense"); *but see United States v.*

*Farmer*, 274 F.3d 800, 805 (4th Cir. 2001) (hearing will provide defendant with opportunity to

prove by preponderance of the evidence that government seized untainted funds without probable cause).

On the question of financial need, the parties have assumed (as did the court) that Defendant's financial need for access to some or all the restrained assets remained a live issue for resolution on the basis of evidence produced prior to and at the *Monsanto* hearing.  On further reflection and after careful review of the case law, the court concludes that the single controlling question at this stage is whether the government has met its relatively modest burden of showing probable cause to believe that the restrained asserts are forfeitable.  The most persuasive cases describe the showing of financial need a defendant must make to obtain a *Monsanto* hearing as nothing more than a *threshold* showing.  The cases appear to provide that, if a defendant crosses this threshold, then, as a next step, "due process requires a district court to conduct an adversarial hearing at which the government must establish probable cause to believe that the restrained assets are traceable to the underlying offense[s]."  *Jones,* 160 F.3d at 647; *see also Bonventre*, 720 F.3d at 131 (defendant must make a sufficient evidentiary showing of financial need; at the subsequent hearing, the government has the burden of showing probable cause for forfeiture).  This threshold showing of financial need is intended to operate as a limit on the number of cases in which such hearings must be held, thereby conserving the resources of the courts and the government.  *See, e.g., Bonventre*, 720 F.3d at 132-133 (affirming district court's denial of evidentiary hearing on grounds that defendant failed to satisfy threshold burden of demonstrating financial need); *Farmer,* 274 F.3d at 805 (threshold showings protect the government and its resources from frivolous challenges to forfeiture); *Jones*, 160 F.3d at 647 (same); *Emor*, 794 F. Supp. 2d at 150 (demonstration of financial need is a *threshold* requirement; there is no hearing unless defendant has first made the requisite showing).

It would be anomalous to permit a pre-trial restraint on a defendant's assets to remain in force if, on hearing, the government cannot demonstrate probable cause to believe the assets are subject to forfeiture, regardless of whether Defendant claims to need the assets to mount a defense. "The procedural aspect of the Fifth Amendment Due Process Clause guarantees that government action may not deprive a person of . . . property unless the government affords a fair procedure to contest the deprivation." *Jones*, 160 F.3d at 645. If, when a defendant contests the pre-trial deprivation of property at such a fair procedure, the government fails to show probable cause that it is entitled to a pre-trial restraint on a defendant's assets, there would seem to be no basis on which to maintain the restraint. Accordingly, the court turns to the question of whether the government has shown probable cause to believe that some or all of the Tobacco Funds are subject to forfeiture.[3]

   2.   Asserted bases of forfeiture

"The Federal Rules of Criminal Procedure require that 'if the government seeks forfeiture of specific property, the court must determine whether the government has established the requisite nexus between the property and the offense.'" *Capoccia*, 503 F.3d at 115 (quoting Fed. R. Civ. P. 32.2(b)(1)). Here, the government seeks forfeiture of specific property and will be

---

[3] To the extent Defendant's financial ability to pay for counsel of his choice remains a factor at this stage, the court is not persuaded that Defendant has sufficiently demonstrated that he lacks the financial resources to retain his counsel of choice to defend this case. As the government points out, Defendant continues to support himself and his family in a relatively luxurious manner and he retains ownership of substantial assets and businesses. Perhaps most importantly, if Defendant lacks assets to retain counsel of his choice, it is in significant part because of financial investments he made in businesses he owns at a point in time when he knew that he was facing possible indictment (Hrg. Trans. at 49). A defendant cannot choose to use untainted funds that would be sufficient to retain counsel of choice for business purposes, then claim that he is entitled to access to restrained funds because he cannot otherwise pay his attorney. *See United States v. Emor*, 794 F. Supp. 2d 143, 150 (D.D.C. 2011) (quoting *United States v. Egan*, Crim. No. 10-191, 2010 WL 3000000, at *5 (S.D.N.Y. July 9, 2010) (*Monsanto* hearing not required when defendant merely prefers to use restrained funds rather than untainted assets to pay counsel of choice).

required at trial to establish the requisite nexus between the crimes charged in the indictment and the Scranton Tobacco. *See generally id.*

    a.  <u>Forfeiture based on alleged money laundering</u>

In counts eighteen through twenty-seven in the indictment, Defendant is charged with money laundering under 18 U.S.C § 1956(a)(1)(B)(i), which defines money laundering as an instance when a person:

> knowing that the property involved in a financial transaction represents the proceeds of some form of unlawful activity, conducts or attempts to conduct such a financial transaction which in fact involves the proceeds of specified unlawful activity . . . knowing that the transaction is designed in whole or in part – to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of specified unlawful activity[.]

Defendant also is charged under 18 U.S.C. § 1957(a), which prohibits knowingly engaging or attempting to engage in monetary transactions in criminally derived property of a value greater than $10,000 that is derived from specified unlawful activities, and 18 U.S.C. § 1956(h), which punishes conspiracy to engage in money laundering to the same extent that the underlying offense is punished.  The specified unlawful activities set forth in the indictment are wire fraud and trafficking in contraband tobacco.  *See* 18 U.S.C. §§ 1956(c)(7)(A); 1961(1).  Count seventeen, the conspiracy count, charges Defendant with conduct beginning in or around 2008 and continuing through June 5, 2012, the date on which the Scranton Tobacco was seized.  Pursuant to 18 U.S.C. § 982(a)(1), which governs criminal forfeiture, when a defendant is convicted of an offense in violation of 18 U.S.C. §§ 1956 or 1957, the defendant must forfeit to the government "*any property, real or personal, involved in such offense or traceable to such property.*"  (Emphasis supplied.)

The forfeiture provisions that come into play when a defendant is convicted of money laundering are broad.  Property "involved" in money laundering includes "the money or other

property being laundered (the corpus), any commissions or fees paid to the launderer, and any property used to facilitate the laundering offense." *United States v. McGauley*, 279 F.3d 62, 76 n.14 (1st Cir. 2002) (citing *United States v. All Monies ($477,048.62) in Account 90-3617-3*, 754 F. Supp. 1467, 1473 (D. Haw. 1991)).  Forfeiture based on a conviction for money laundering "applies to more than just the laundered property or proceeds from the laundered property." *United States v. Coffman*, 859 F. Supp. 2d 871, 875 (E.D. Ky. 2012).  The statute directs forfeiture of "all property 'involved in' the crime, which can include clean or legitimate [property] that is commingled with tainted [property] derived from illicit sources." *Id.*; *see also McGauley*, 279 F.3d at 75; *United States v. Tencer*, 107 F.3d 1120, 1134-1135 (5th Cir. 1997) (forfeiture of commingled funds is permissible under the statute because criminal activity such as money laundering largely depends on use of legitimate funds to advance or facilitate scheme). Property paid for with funds from accounts where allegedly clean money is commingled with money derived from illicit sources – and where the commingling is for the purpose of disguising the nature, location or source of the illicit funds – is subject to forfeiture.  *See Coffman*, 859 F. Supp. 2d at 875 (yacht purchased with funds from account where "clean" money was commingled with illicit funds was subject to forfeiture); *see also United States v. Armstrong*, No. 05-130, 2007 WL 809508, at *3 (E.D. La. Mar. 14, 2007) ("property traceable" means property where the acquisition is attributable to the money laundering scheme rather than to money obtained from untainted sources).

Property, or money derived from legitimate sources, that is used to facilitate money laundering by means other than by commingling also is subject to forfeiture.  *See United States v. George*, 761 F.3d 42, 60-61 (car where defendant discussed money laundering scheme sufficiently connected to criminal conduct to support forfeiture); *McGauley,* 279 F.3d at 75;

*Coffman*, 859 F. Supp. 2d at 876.   Property facilitates money laundering when the property is used to make the money laundering less difficult or more free from obstruction, hinderance, or detection. *See McGauley*, 279 F.3d at 75-76.  "'[F]acilitation' require[s] that there be 'a substantial connection between the property and the underlying criminal activity.'" *United States v. Matai*, 173 F.3d 426, 1999 WL 61913, at *4 (4th Cir. 1999) (unpublished disposition) (quoting *United States v. Schifferli*, 895 F.2d 987, 989 (4th Cir. 1990)); *see also In re Restraint of Bowman Gaskins Fin. Group*, 345 F. Supp. 2d 613, 622-623 (E.D. Va. 2004).  "The so-called 'substantial connection' test is not a measure of the amount of money laundered." *United States v. Swank*, 797 F. Supp. 497, 503 (E.D. Va. 1992) (citing *United States v. Premises Known As 3639-2nd St. N.E.*, 869 F.2d 1093 (8th Cir. 1989)).  The quantity of money laundered can be relatively small, if the relationship between the forfeitable property and the crime is substantial. *See id.*[4]

"Probable cause . . . is not a high bar:  It requires only the 'kind of 'fair probability'' on which 'reasonable and prudent [people,]' not legal technicians, act.'" *Kaley,* 134 S.Ct. at 1103 (quoting *Florida v. Harris*, 133 S.Ct. 1050, 1055 (2013) (quoting *Illinois v. Gates*, 462 U.S. 213, 231 (1983)).  In the court's view, for the following reasons, the government has shown probable cause to believe that the Scranton Tobacco is subject to forfeiture as property involved in money laundering.

---

[4] The First Circuit requires a substantial connection between the asset to be forfeited and the alleged criminal conduct for purposes of civil forfeiture.  The First Circuit has not yet ruled on the degree of connection required by the criminal forfeiture statute between the asset to be forfeited and the criminal conduct at issue.  *See United States v. George,* 761 F.3d 42, 61 (1st Cir. 2014) (citing *United States v. Heldeman*, 402 F.3d 220, 222 (1st Cir. 2005)).  A Lexus used to host the discussion of a money laundering scheme, *see George,* 761 F.3d at 60-61, cannot be described as integral to such a scheme, which could just as well have been discussed in any other location where the parties to the conversation would not have been observed or overheard.  Thus, the *George* case does not appear to require much – if anything – more than a substantial connection between the asset to be forfeited and the alleged criminal conduct.

i.    Part of the Scranton Tobacco was paid for with tainted funds commingled with untainted funds

The indictment alleges that Defendant conspired with others to launder the cash derived from wire fraud and contraband trafficking in smokeless tobacco by transporting cash generated by unlawful tobacco sales by the Springfield and Danbury warehouses to Defendant's Connecticut office and by depositing such cash in bank accounts of C&S, the Hawthorne Inn and the Litchfield Inn, and in Defendant's attorney's IOLTA account, thereby commingling the tainted funds with untainted funds for the purpose of concealing the nature, location, source, ownership, and control of the funds received by C&S for product shipped to Springfield and Danbury (Dkt. No. 2 at 19-20).  The government contends that any portion of the Scranton Tobacco that C&S had paid for as of the June 5, 2012 seizure was paid for with funds from bank accounts where untainted funds had been commingled with tainted funds from Springfield and Danbury.  It argues that, for this reason, the portion of the Scranton Tobacco for which payment had been made is subject to forfeiture.  In Defendant's view, the government can succeed on this theory of forfeiture only if it can prove the specific amount of money that came from Springfield and Danbury, and that it has failed to do so (Dkt. No. 96 at 11-12).  The government has the better of these arguments.

Accepting as true the allegations in the indictment, a finder of fact could conclude that funds in the C&S bank accounts were commingled with tainted funds from Springfield and Danbury for the purpose of concealing the origin of the tainted funds.  It is well-settled in the First Circuit, that, in such circumstances, a finder of fact would "be entitled to infer that all of the funds in the account[s] were 'involved in' the money laundering and subject to forfeiture pursuant to § 982." *McGauley*, 279 F.3d at 75 (citing *Tencer*, 107 F.3d at 1135; *Baker*, 227 F.3d at 970 n.4); *see also United States v. Aguasvivas-Castillo*, 668 F.3d 7, 17 (1st Cir. 2012); *United*

*States v. Iacaboni*, 221 F. Supp. 2d 104, 117 (D. Mass. 2002), *aff'd in part and rev'd in part on other grounds*, 363 F.3d 1 (1st Cir. 2004). The next step is hardly a leap: items – such as any of the Scranton Tobacco that had been paid for by the time of seizure – purchased with funds "involved" in money laundering are subject to forfeiture as "property traceable to such property." 18 U.S.C. § 982(a). *See, e.g. Coffman*, 859 F. Supp. 2d at 881.

Defendant's fundamental argument against forfeiture of the Scranton Tobacco is that, to the extent C&S received product on credit and had not yet paid for it, it was not purchased with the proceeds of the criminal activity alleged in the indictment, and it had not been distributed in furtherance of the tax avoidance scheme. Accordingly, Defendant reasons, the Scranton Tobacco lacks the requisite nexus to the charged offenses (Dkt. 27 at 3). *See* Fed. R. Crim. P. 32.2(b). In reliance on this argument (and, perhaps anticipating the conclusion that product that had been paid for would be subject to forfeiture as property traceable to funds involved in money laundering), Defendant has invested substantial effort in contesting the government's alternate proposals for quantifying the portion of the Scranton Tobacco that had been paid for as of June 5, 2012 (Dkt. No. 96 at 13-14; Dkt. No. 104), and relies on unpaid invoices that, he claims, show that as of June 5, 2012, C&S owed its suppliers an amount roughly equivalent to the value of tobacco seized by the government on that date.

The court is not persuaded by Defendant's reliance on invoices as proof of the amount of product in the warehouse that had not been paid for as of June 5, 2012. As a general matter, a business may distribute product before it pays its suppliers for that product. The evidence sufficiently establishes that C&S sold product that it had not yet paid for, inasmuch as product generally left the Scranton warehouse within two weeks of delivery, while HLA invoices could remain unpaid for up to three or four weeks (Exh. 44 at 47; Exh. 46). In cases involving money

laundering, where concealment of illicit profits is the very purpose of the crime, the government

often cannot calculate with precision the proceeds realized from the fraudulent conduct.  *See,*

*e.g., Aguasvivas-Castillo*, 686 F.3d at 12.  Similarly, in this case, the government cannot

calculate with precision the percentage of the Scranton Tobacco that had been paid for as of the

date of seizure.  Of the two methods of quantification proposed by the government, the first is

more conservative, in that it is more favorable to Defendant (Dkt. No. 98 at 2-6).  The court is

satisfied that the government's evidence sufficiently establishes probable cause to believe that at

least forty-seven percent (47%) of the product in the Scranton warehouse remained unpaid for as

of June 5, 2012 (Exhs. 16, 43A).  In other words, the first of the two methods of quantification

proposed by the government is, at this preliminary stage, "reasonable, supported by the evidence,

and more than fair to the defendant."  *Iacaboni*, 221 F. Supp. 2d at 118.  While the estimated

47% of the Scranton Tobacco that was provided to C&S on credit was not acquired with funds

involved in money laundering, the remaining 53% was acquired with such funds.  Thus, the

government has shown probable cause to believe that some 53%, or $538,227.44 of the Tobacco

Funds, are subject to forfeiture as property traceable to property involved in a conspiracy to

money launder, the property "involved" in a conspiracy to money launder being the C&S bank

accounts from which funds were drawn to pay for product.[5]

      ii.       <u>C&S was substantially connected to Defendant's illegal activities</u>

---

[5] The Tobacco Funds represent an approximately fifty percent (50%) discount in the value of the
Scranton Tobacco.  Defendant contends that, to the extent the court rules that the government is
not entitled to a pretrial restraint on any portion of the Scranton Tobacco, he is entitled to its full
value, rather than to the diminished amount realized at the interlocutory sale (Dkt. No. 96 at 13).
Defendant provides no legal support for this contention.  While the point is academic, as the
court has concluded that the government is entitled to forfeiture of the Scranton Tobacco in its
entirety, it bears noting that the Defendant's contention is not persuasive where the government
legally seized the Scranton Tobacco on the basis of warrants issued by this court and Defendant
agreed to the interlocutory sale of the products (Dkt. No. 98-3 at 1-4).

The government urges as an additional basis for forfeiture C&S's substantial connection to Defendant's illegal activities, including money laundering, alleged in the indictment.  Courts in other circuits have held that a business's assets that were not purchased with illicit funds are nonetheless subject to forfeiture if the business has a "substantial connection" to, and was used to facilitate, a defendant's illegal activities.  For example, in *In re Bowman Gaskins Fin. Group*, the defendant was charged with visa fraud, money laundering and tax evasion.  He challenged a pre-trial asset restraint on funds transferred from his business to bank accounts in his daughters' names on the grounds that the government had failed to demonstrate probable cause to believe that the property would be subject to forfeiture in the event of his conviction, and he claimed that he needed the funds to pay his attorney.  *See In re Bowman Gaskins Fin. Group*, 345 F. Supp. 2d at 615.  The court held that the government had shown probable cause to believe the funds in the accounts would be subject to forfeiture because the defendant's *entire* business and its assets "facilitated money laundering activity by enabling and providing an appearance of legitimacy to the money laundering financial transactions that were executed to promote the visa fraud scheme."  For this reason, money from the business deposited in the daughters' bank accounts was subject to forfeiture.  *Id.* at 624.

The Fourth Circuit reached a similar conclusion in the *Matai* case.  There, the defendants ran two clothing stores.  They charged sales to stolen credit cards, then rewarded those who had stolen the credit cards with clothing from the store inventories.  The amounts charged to the stolen credit cards were higher than the value of the clothing given to the credit card thieves.  The defendants commingled the proceeds of the stolen credit card transactions with the proceeds of legitimate sales in the merchant checking account of one of the stores.  *See Matai*, 173 F.3d, at *1.  The defendants were charged with credit card fraud and money laundering.  Although there

was no evidence connecting the purchase of inventory to fraudulent credit card transactions, the court affirmed forfeiture of the entire inventory at each of the stores, reasoning that "the use of the stores for the credit card fraud and money laundering operation provided a façade of respectability and lawfulness to the conduct that occurred within." *Id.* at *5; *see also Schifferli*, 895 F.2d at 989-991 (office building housing dentist's office was "substantially connected" to his drug offenses and subject to forfeiture although the majority of the activity on the property was legitimate dentistry and defendant only wrote forty (40) illegal prescriptions on the premises).

Applying these principles to the case at bar, the government has shown probable cause to believe that C&S was substantially connected to the trafficking in contraband smokeless tobacco and the resulting conspiracy to launder money.  The indictment alleges – and it must be taken as true for purposes of this ruling – that C&S supplied the contraband smokeless tobacco to Springfield and Danbury and that it would accept and deposit into its accounts cash payments for tobacco products from the Springfield and Danbury warehouses to avoid creating records that would reveal the nature, location, sources, ownership, and control of these funds, and would then, to further conceal their nature, source and location, use the illicit funds, commingled with legitimate funds, to purchase additional tobacco products.  The indictment further alleges that Defendant caused funds from C&S's bank accounts to be deposited in Defendant's personal bank accounts and in accounts of businesses he owned that were unrelated to the distribution of tobacco products (Dkt. No. 2 at 20-21).  Thus, C&S was integral to the money laundering conspiracy because it provided the primary means of laundering the proceeds of Defendant's conspiracy to traffic in contraband tobacco products and it provided the façade of an apparently legitimate business to conceal illegal conduct.  It follows, then, that C&S assets, such as the Scranton Tobacco, are subject to forfeiture.  *See Matai*, 173 F.3d at *4-5; *Schifferli*, 895 F.2d at

990-991; *In re Restraint of Bowman Gaskins Fin. Group,* 345 F. Supp. 2d at 624; *see also Swank Corp.,* 797 F. Supp. at 502 (citing *United States v. South Side Fin., Inc.*, 755 F. Supp. 791, 797-798 (N.D. Ill. 1991) (a business through which laundered money is moved is forfeitable as property involved in money laundering offense)).

It is true that, applied in this way, the "property involved in money laundering" theory of forfeiture sweeps broadly.  So far as the court has been able to determine, the First Circuit has not had occasion to consider whether, when an indictment alleges that a business is substantially connected to money laundering, *any* asset of that business is potentially subject to criminal forfeiture.  But the First Circuit has already endorsed a broad reading of the "involved in" provision of 18 U.S.C. § 1956(b)(1)(A):  in *Aguasvivas-Castillo*, the First Circuit approved forfeiture of $20,000,000 in receipts from the food stamp program as money "involved in" money laundering where the proceeds from the defendant's food stamp fraud were conservatively estimated at $4.4 million.  *See Aguasvivas-Castillo*, 668 F.3d at 17.  The *Aguasvivas-Castillo* court held that because the defendant had been convicted of money laundering and the funds that were fraudulently obtained had been commingled with legitimate funds, all of the funds, including the presumably legitimate funds received from the Food Stamp Program, were subject to forfeiture.  *Id.*  In addition, this court applied a "substantial connection" test in the *Iacaboni* case, which was, in substantial part, affirmed on appeal.  *See Iacaboni,* 221 F. Supp. 2d at 116, *aff'd in part and rev'd in part,* 363 F.3d 1.  Accordingly, it seems likely that the First Circuit would view C&S as an entity substantially connected to Defendant's conspiracy to traffic in contraband tobacco and to launder the resulting proceeds, and would approve forfeiture of its assets on this basis.

For all of the foregoing reasons, the court concludes that the government has satisfied its burden of showing probable cause to believe that the Scranton Tobacco in its entirety (or, to be precise, the $1,015,523.48 in Tobacco Funds) will be subject to forfeiture as property involved in money laundering.  *See Matai*, 173 F.3d at *4-5; *Schifferli*, 895 F.2d at 990-991; *Coffman*, 859 F. Supp. 2d at 881; *In re Restraint of Bowman Gaskins Fin. Group*, 345 F. Supp. 2d at 624; *see also Swank Corp.*, 797 F. Supp. at 502.

3.  Forfeiture based on alleged wire fraud

Defendant also is charged, under 18 U.S.C. §§ 1343 and 1349, with wire fraud and conspiring to commit wire fraud.  A person commits wire fraud when, "having devised or intended to devise any scheme or artifice to defraud . . . [the person] transmits or causes to be transmitted by means of wire . . . communication in interstate commerce, any writings . . . for the purpose of executing such scheme[.]"  18 U.S.C. § 1343.  Section 1349 of Title 18 of the United States Code makes it an offense for anyone to conspire to or attempt to commit wire fraud. "'Any property, real or personal, which constitutes or is derived from proceeds traceable to' a wire fraud offense is subject to criminal forfeiture."  *Emor*, 850 F. Supp. 2d at 217 (citing 18 U.S.C. § 981(a)(1)(C)).  "When a defendant has engaged in a mail or wire fraud scheme, forfeiture is not limited to the proceeds gained through a particular mailing or wire transaction [alleged in an indictment]; rather, it 'extends to the entire scheme' of which the mailing or wire transaction was a part."  *Id.* (quoting *United States v. Venturella*, 585 F.3d 1013, 1015 (7th Cir. 2009)).  The government contends that because the indictment alleges a continuing scheme to defraud, any property or proceeds from the entire scheme are subject to forfeiture (Dkt. No. 97 at 21).

The court is not persuaded, on the evidence submitted, that the government has shown probable cause to believe that the Scranton Tobacco is forfeitable as proceeds of Defendant's wire fraud conspiracy.  In support of the charge of conspiracy to engage in wire fraud, the indictment charges, in summary, that Defendant's co-conspirators would fax tobacco orders to the C&S on a weekly or twice weekly basis, that Defendant, with others, would distribute tobacco products from the Scranton warehouse to the Springfield and Danbury warehouses; that the business entities based in the Springfield and Danbury warehouses would distribute the tobacco products in Massachusetts and Connecticut without including the price of the tobacco excise taxes in the prices charged to customers; that various false or misleading documents were transmitted across state lines in furtherance of the tax avoidance scheme; and that cash generated by the scheme was deposited in the bank accounts of C&S, Defendant and Defendant's attorney (Dkt. No. 2 at 10-15).

The government could perhaps use C&S business records to prove to the requisite degree of certainty that some portion of the Scranton Tobacco was acquired with proceeds from the wire fraud conspiracy alleged in the indictment, but it has not done so here.  Although the government has suggested that Defendant's fraudulent conduct extended more broadly, it acknowledges that the indictment alleges that only two of five warehouses to which C&S regularly distributed tobacco products were involved in the wire fraud conspiracy (Dkt. No. 97 at 9).  Thus, proceeds traceable to the wire fraud conspiracy can only be monies generated by the fraudulent business allegedly conducted from those two warehouses.  *See United States v. Nicolo*, 597 F. Supp. 2d 342, 347 (W.D.N.Y. 2009), *aff'd*, 421 Fed. Appx. 571 (2d Cir.), *cert. denied*, 132 S.Ct. 338 (2011) (with respect to fraud forfeiture, a defendant may be ordered to forfeit all monies received as result of fraud, regardless of net profit).  The Scranton Tobacco, to the extent it was paid for

with proceeds from the fraudulent business conducted in Springfield and Danbury, would be subject to forfeiture as property derived from proceeds of the offense.  *See id.* at 346.  The pre-trial asset restraint on the Scranton Tobacco, however, is not so limited, and the government's evidentiary submissions do not attempt to establish how much of C&S's business was traceable to the fraudulent scheme allegedly operated out of the Springfield and Danbury warehouses.

In the court's view, the cases on which the government relies in arguing that assets of C&S are subject to forfeiture as proceeds of fraudulent conduct are distinguishable from the case at bar or fail to support the breadth of the principle advanced here by the government.  In *Emor*, the court's opinion carefully detailed an enterprise dedicated to stealing public funds that were supposed to be used to educate special needs students.  *See Emor*, 850 F. Supp. 2d at 187-200.  The court entered a broad forfeiture order, *but* it was limited to the amount of the losses attributable to the defendant's purchases for his personal benefit and his fraudulent transfer of funds to a separate entity over which he held exclusive control.  The court found that this entity never engaged in any of the activities it was purportedly formed to carry out and inferred that the separate entity was established so that the defendant could exploit the funds transferred to it for his personal use and gain.  *See id.* at 191.  In sum, the court only ordered forfeiture of funds that the government proved to be direct proceeds of the defendant's fraudulent conduct.  Similarly, in *Nicolo*, as to the forfeiture of fraud proceeds, the government only sought, and the court only ordered, forfeiture of the gross proceeds directly traceable to the defendant's fraud offenses.  *See Nicolo,* 597 F. Supp. 2d at 349-350.

The case which comes closest to supporting the government's position is *United States v. Farkas*, No. 1:10cr200 (LMB), 2011 WL 5101752 (E.D. Va. Oct. 26, 2011).  In that case, the dispute between the defendant and the government was whether the government had established

the requisite nexus between the funds to be forfeited and the defendant's mail and wire fraud violations. *See id.* at *2. The defendant ran a corporation engaged in the business of obtaining mortgage funding, securitizing mortgages, and selling mortgage-backed securities. He used assets from the company to support his extravagant life style. *Id.* at *3, 5. He was convicted of conspiring to commit mail and wire fraud based on illegal measures taken to hide the corporation's financial difficulties. The court ordered forfeiture of the funds identified by the government because the funds were either the direct proceeds of fraudulent conduct, *see id.* at *4-5, or were "'indirectly derived from' the fraud schemes, insofar as [the defendant] would not have had access to these funds if the direct proceeds from the fraud were not keeping [the business] solvent." *Id.* at *5. The critical difference between the *Farkas* case and this case is that here, the government has not shown probable cause to believe that C&S would not have been solvent absent Defendant's fraudulent conduct or that the fraud was essential to maintaining C&S as a going concern. It may be that one or the other (or both) of these propositions is true, but speculation is not sufficient to meet the government's burden of proof. Because the government has not shown that, but for Defendant's fraudulent conduct, C&S would not have acquired the Scranton Tobacco, or that C&S would not have been solvent but for fraud, the government has not shown a basis for a pre-trial restraint on this property as the proceeds of fraud. *Contrast, e.g., Melrose East Subdivision*, 357 F.3d at 507-508 (government made sufficient showing to justify restraint on properties acquired by business where government's evidence showed that *all* of business's Medicaid billings were fraudulent at the time the properties were acquired).

V.     C&S Conclusion

For the reasons set forth above, Defendant's Motion for Order Releasing Seized Funds

Necessary for Legal Defense is DENIED.

It is so ordered.

Dated:  July 27, 2015                          /s/ Katherine A. Robertson
                                               KATHERINE A. ROBERTSON
                                               U.S. MAGISTRATE JUDGE