UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 14-cr-30044-MGM |
| | ) | |
| SYED BOKHARI, | ) | |
| | ) | |
| Defendant. | ) | |

MEMORANDUM AND ORDER ON DEFENDANT'S MOTION FOR RELEASE
OF FUNDS NECESSARY FOR LEGAL DEFENSE AND ON THE GOVERNMENT'S
MOTION FOR ACCESS TO RECORDS FILED *EX PARTE* AND UNDER SEAL
(Dkt. Nos. 27 & 145)

ROBERTSON, U.S.M.J.

I.    INTRODUCTION

Defendant Syed Bokhari ("Defendant") was initially indicted on charges of wire fraud,

money laundering, aiding and abetting contraband smokeless tobacco trafficking, and violations

of the PACT (Prevent All Cigarette Trafficking) Act (Dkt. No. 2).  The indictment included

forfeiture allegations, including an allegation that $1,015,523.48 in proceeds from the sale of 147

pallets of smokeless tobacco, cigars, and other non-cigarette tobacco products ("Tobacco

Funds"), which the government seized from a warehouse in Scranton, Pennsylvania ("Scranton

Warehouse"), was subject to forfeiture.

In December 2014, Defendant filed a motion seeking release of a portion of the Tobacco

Funds to retain counsel of his choice (Dkt. No. 27).  In July 2015, this court ruled that the

government had demonstrated probable cause to believe that the Tobacco Funds were subject to

forfeiture under the original indictment and denied Defendant's motion (Dkt. No. 112).  The

presiding District Judge reviewed this court's order and remanded the matter for a further

evidentiary hearing before the undersigned to give Defendant the opportunity to make a showing

that he had financial need for part or all of Tobacco Funds to pay counsel of his choice (Dkt. No.

133 at 14).  On December 3, 2015, Defendant was charged in a superseding indictment with,

among other things, conspiracy under the Racketeer Influenced and Corrupt Organizations

("RICO") Act in violation of 18 U.S.C. § 1962(d) (Dkt. No. 137).  The superseding indictment

also contains forfeiture allegations, including the allegation that the Tobacco Funds are subject to

forfeiture under the RICO Act, 18 U.S.C § 1963(a).

    While continuing to press his motion for release of a portion of the Tobacco Funds,

Defendant has invoked his Fifth Amendment privilege against self-incrimination (Dkt. No. 141).

The government opposes any release of the Tobacco Funds to Defendant and, by motion, seeks

access to Defendant's financial information that previously was filed *ex parte* and under seal, or

in the alternative, that the court disregard these filings in any ruling on Defendant's financial

status (Dkt. No. 145).  For the following reasons, Defendant's renewed motion for release of

funds is denied.  In light of the basis for the court's ruling on Defendant's motion, the

government's motion for access to records that were filed *ex parte* and under seal is also denied.

## II.    PROCEDURAL BACKGROUND

    This court's order of July 27, 2015 details the procedural history of this case prior to that

date, as follows (Dkt. No. 112).  *See United States v. Bokhari*, Criminal Case No. 3:14-300440-

MGM, 2015 WL 4529611 (D. Mass. July 27, 2015) ("*Bokhari I"*).

> On June 5 and 8, 2012, pursuant to search and seizure warrants issued by this court, the
> government seized assets of Defendant, including bank accounts, motor vehicles, cash,
> and tobacco products that were in the Scranton Warehouse ("Scranton Tobacco") (Dkt.
> No. 98 at 1).  On October 1, 2012, the government filed a civil forfeiture proceeding for
> possession of the seized assets (Case # 3:12-cv-30167-RWZ).  In November 2013, after
> certain assets had been returned to Defendant, the parties entered into a settlement
> agreement in the civil forfeiture case, which provided, inter alia, that the United States
> would retain custody of the Scranton Tobacco unless the parties agreed to the forfeiture

or release of the Scranton Tobacco or the United States filed an indictment that included the Scranton Tobacco as forfeitable, in which case the parties agreed that the United States would retain custody of the Scranton Tobacco until final adjudication of the criminal case, or until such time as "an order for the return of some or all of the Scranton Tobacco prior to the final adjudication of the criminal case was entered by the District Court presiding over such criminal case" (Dkt. No. 279-1 at 13, Docket for Case # 3:12-cv-30167-RWZ).

*Bokhari I*, at *1-2.

In compliance with an agreement for interlocutory sale between the government and Defendant, the Scranton Tobacco was sold at auction (Dkt. No. 98-3).  The 147 pallets of tobacco products yielded the Tobacco Funds, $1,015, 523.48 after sales expenses (Dkt. No. 96 at 7, Exhs. 41, 42).

On October 16, 2014, Defendant was charged in a thirty-two count indictment with, inter alia, conspiracy to commit money laundering, specific acts of money laundering, and money laundering in violation of 18 U.S.C. §§ 1957 and 2 (Dkt. No. 2).  The indictment included the Tobacco Funds as forfeitable property (*id.*).  Defendant's Motion for Release of Funds Necessary for Legal Defense was filed on November 24, 2014 (Dkt. No. 27).  "[F]ollowing a review of [the parties' *ex parte*] submissions, the court allowed so much of Defendant's Motion as sought an evidentiary hearing on the question of the Government's right to a continuing pre-trial restraint on assets Defendant claims he needs to retain his counsel of choice (Dkt. No. 73)."  *Bokhari I*, at *2.

The evidentiary hearing was held on March 26, 2015 (Dkt. No. 88).  On July 27, 2015, the court denied Defendant's motion based upon the government's demonstration of probable cause to believe that the Tobacco Funds would be forfeit if Defendant were convicted of money laundering.  *See Bokhari I*, at *7-10, *12.  Defendant objected to this court's order (Dkt. No. 120).  *See* Fed. R. Crim. P. 59(a).  The government countered that this court's ruling was correct

and argued that Defendant should not have been granted an evidentiary hearing because he failed to make the requisite showing of financial need for the funds (Dkt. No. 122). After a hearing on November 19, 2015, the District Judge determined that a "new hearing before [this court] on the question of Defendant's financial need is required" and stated that, to make an adequate showing in support of his motion for release of funds Defendant would need to produce "additional documentary evidence that demonstrates Defendant's net worth and provides a comprehensive listing of his assets, sources of income, expenses, and liabilities" in order for Defendant to prove his financial need by a preponderance of the evidence (Dkt. No. 133 at 11, 13-15). *United States v. Bokhari*, Criminal Case No. 14-30044-MGM, 2015 WL 7303535, at *6-7 (D. Mass. Nov. 17, 2015) ("*Bokhari II*").

On December 3, 2015, Defendant was charged by way of a thirty-five count superseding indictment with the following crimes: racketeering conspiracy, in violation of 18 U.S.C. § 1962(d) (count one); wire fraud (counts two through eleven); aiding and abetting contraband smokeless tobacco trafficking (counts twelve through sixteen); conspiracy to commit money laundering (count seventeen); specific acts of money laundering (counts eighteen through twenty-five); money laundering in violation of 18 U.S.C. § 1957 (counts twenty-six through thirty); and violation of the PACT Act (counts thirty-one through thirty-five) (Dkt. No. 137). In addition, the government moved for asset forfeiture pursuant to 18 U.S.C. §1963 (RICO), 18 U.S.C. § 981 and 28 U.S.C. § 2461 (wire fraud and contraband smokeless tobacco trafficking), and 18 U.S.C. § 982 (money laundering) (*id.*). The Tobacco Funds are included as forfeitable property (*id.*).

At Defendant's December 10, 2015 arraignment on the superseding indictment, Defendant represented that he intended to file additional documentary evidence demonstrating

his net worth consistent with the District Judge's Memorandum and Order, and that he was not moving for leave to file this evidence on an *ex parte* basis.  The court set deadlines for submissions by the parties of further filings related to Defendant's motion for release of funds on a sealed basis.  Rather than filing a comprehensive listing of his assets, sources of income, expenses, and liabilities, Defendant's further filing invoked his right against compelled self-incrimination under the Fifth Amendment to the United States Constitution due to the "nature of the allegations contained in the Superseding Indictment" (Dkt. No. 141).  For its part, the government filed two affidavits from an Internal Revenue Service investigator, which provided some additional information about Defendant's financial resources, including the fact that Defendant did not file income tax returns for the years 2012, 2013, and 2014 (Dkt. No. 144; Dkt. No. 144-2 ¶8).  The government also moved for access to Defendant's financial information previously filed *ex parte* and under seal, or, in the alternative, for the court to disregard those financial disclosures when ruling on Defendant's motion for access to the Tobacco Funds (Dkt. No. 145).  The parties presented argument on the Defendant's motion for release of funds (Dkt. No. 146), and, thereafter, filed supplemental briefs addressing the effect of the RICO allegations in the superseding indictment on the government's right to a pre-trial restraint of the Tobacco Funds (Dkt. Nos. 149 and 151).

III.  RELEVANT FACTS ALLEGED IN THE SUPERSEDING INDICTMENT TO SUPPORT THE CHARGE OF CONSPIRACY TO VIOLATE THE RICO ACT

The government alleges that from about 2005 until June 5, 2012, when the search and seizure warrant was executed at the Scranton Warehouse, Defendant conducted a racketeering conspiracy through his control of an enterprise, which the government christens Bokhari, Inc., and which this court will refer to as the alleged RICO enterprise ("ARE"), which operated four warehouses and twenty gas stations and convenience stores in Massachusetts and Connecticut

(Dkt. No. 137 at ¶¶11, 12).  The racketeering conspiracy was designed to evade Massachusetts and Connecticut excise taxes on smokeless tobacco and cigars through the underreporting of sales and the filing of false state tax returns.

Both Massachusetts and Connecticut impose excise taxes on smokeless tobacco and cigars and the federal government requires interstate sellers of tobacco products to report their sales to state authorities (*id*. at ¶¶2, 5, 7).  Massachusetts wholesalers who distribute smokeless tobacco and cigars are required to be licensed by the Massachusetts Department of Revenue ("DOR") (*id.* at ¶1).  A wholesale business that sells smokeless tobacco in Massachusetts must, each month, file an excise tax return and pay excise tax on the smokeless tobacco that is brought into the state (*id.* at ¶2).  Massachusetts mandates the filing of quarterly excise tax returns and the payment of excise taxes on cigars that are imported into the Commonwealth (*id.*).  The law requires that "[t]he amount of the excise advanced and paid by a [tobacco wholesaler or retailer] . . . be added to and collected as part of, the sales price" of cigars and smokeless tobacco.  Mass. Gen. Laws ch. 64C, § 7B(d).  A Connecticut wholesale distributor of smokeless tobacco and cigars is obligated to obtain a state license, to file a tobacco products tax return each month, and to pay excise tax on the tobacco products "purchased, imported, received, or acquired" (Dkt. No. 137 at ¶¶3, 4, 5).  In relevant part, the federal PACT Act requires "[a]ny person who sells, transfers, or ships for profit cigarettes or smokeless tobacco in interstate commerce" into a state "taxing the sale or use of cigarettes or smokeless tobacco" to register with the "Attorney General of the United States and with the tobacco tax administrators of the State . . . into which such shipment is made" and to file "a memorandum or a copy of the invoice covering each and every shipment of cigarettes or smokeless tobacco" with the "chief law enforcement officers of the local governments . . . that apply their own local . . . taxes on cigarettes or smokeless tobacco"

6

(Dkt. No. 137 at ¶¶6, 7).  15 U.S.C. § 376(a).  The memorandum or invoice must contain specific information about each shipment of cigarettes and smokeless tobacco, including the name and address of the person who received the shipment, and the brand and quantity of the products that were shipped.  *Id.*

Between 2005 and 2006, Massachusetts and Connecticut levied substantial state tobacco excise tax assessments against Defendant's wholly owned corporation that operated warehouses in Springfield, Massachusetts ("Springfield Warehouse") and Berlin, Connecticut ("Berlin Warehouse") (Dkt. No. 137 at ¶¶14, 15, 16).  After the Massachusetts DOR served Defendant with a summons regarding its tax investigation, Defendant established a wholesale tobacco business at the Scranton Warehouse in Pennsylvania, which is the only state that does not impose an excise tax on smokeless tobacco and cigars (*id.* at ¶¶16, 17, 69).  Defendant operated the Scranton Warehouse through a Pennsylvania Corporation, Cigar & Supplies, Inc. ("C & S") (*id.* at ¶17).  Defendant, along with others, also operated the Springfield Warehouse and a similar wholesale business in Danbury, Connecticut ("Danbury Warehouse") by means of a series of nominal corporations and entities, while Defendant retained *de facto* ownership and control (*id.* at ¶¶14, 19, 23, 70, 77, 78, 79, 80, 93, 94, 95, 99, 100, 101, 102, 103, 106, 108, 109).  Defendant sold the Berlin Warehouse in September 2006, but remained involved in the business's operation (*id.* at ¶¶15, 24, 25, 71, 72, 73, 74, 84, 85, 88, 89, 91, 96, 97, 98).  In addition to the warehouses, Defendant owned and operated twenty gas stations and convenience stores in Massachusetts and Connecticut ("Gas Station Component") (*id.* at ¶18).  The four warehouses and the Gas Station Component constitute the ARE (*id.* at ¶¶11, 12).

In response to orders, some of which were transmitted by fax, the Scranton Warehouse supplied tobacco products, including smokeless tobacco and cigars, to the ARE's other

warehouses in Springfield, Danbury, and Berlin, to wholesalers in Hamden, Connecticut

("Hamden Warehouse") and Attleboro, Massachusetts ("Attleboro Warehouse"), which were not

owned or controlled by Defendant (collectively "the five warehouses"), and to the Gas Station

Component of the ARE (*id*. at ¶¶8, 9, 14, 15, 18, 19, 26, 27, 28, 51, 52, 69, 75).[1]  The five

warehouses were wholesale distributors of tobacco products and non-tobacco items to retail

establishments (*id*. at ¶¶8, 9, 14, 15, 19).  The Gas Station Component sold tobacco products and

other items at retail (*id*. at ¶51).

The Scranton Warehouse was not required to pay state excise tax on its smokeless

tobacco and cigars (*id.* at ¶17).  But as an interstate seller of smokeless tobacco, the Scranton

Warehouse violated the PACT Act by failing to report to the Massachusetts and Connecticut tax

authorities its shipments of smokeless tobacco to the five warehouses and to the Gas Station

Component (*id.* at ¶¶6, 7, 27, 28, 40, 54).

The Springfield, Danbury, and Berlin Warehouses, which were part of the ARE, did not

include excise taxes in the prices that they charged their customers for most smokeless tobacco

and cigars (*id.* at ¶¶11, 34, 37).  This enabled these warehouses to capture market share from

wholesalers who included taxes in their prices for tobacco products (*id.* at ¶21).  The three ARE

warehouses used "'no tax'" computers to calculate the cost of tobacco products for customers

who did not want the state excise tax to be included in the prices that they paid to the ARE (*id.* at

---

[1] Faxed orders from the Springfield Warehouse to the Scranton Warehouse on February 12 and June 25, 2010 and on January 7, February 10, and March 25, 2011 form the basis of Counts 4, 5, 7, 9 and 10 of the superseding indictment, which charge Defendant with wire fraud, in violation of 18 U.S.C. §1343 (Dkt. No. 137 at ¶111).

¶¶35, 38).[2]  But the Springfield Warehouse sold a small number of cigars with the tax included in the price, and the Berlin and Danbury Warehouses sold small quantities of smokeless tobacco and cigars in this manner (*id*. at ¶¶36, 39, 81).  Each month, the Springfield, Berlin, Danbury, and Hamden Warehouses informed Defendant, or his employee at the Scranton Warehouse, of the amounts of tax-included smokeless tobacco and cigars that they sold to their customers (*id*. at ¶¶36, 39, 41, 42, 76).  Either Defendant or a Scranton Warehouse employee, who acted at Defendant's behest, prepared "fake invoices" to reflect:  the approximate number of cigars that the Springfield Warehouse sold to customers with the Massachusetts excise tax included in the price during the preceding quarter; and the quantity of cigars and smokeless tobacco that the Berlin, Danbury and Hamden Warehouses sold with the Connecticut excise tax added to the purchasers' costs (*id*. at ¶¶7, 43, 44, 68, 76).  The ARE warehouses provided the phony invoices to an accountant, who used them -- with Defendant's knowledge -- to prepare and file Massachusetts and Connecticut excise tax returns, which "vastly underreported the true volume [the warehouses] received" from the Scranton Warehouse (*id*. at ¶¶43, 44, 46, 47, 48, 49).  The Springfield Warehouse did not pay any Massachusetts excise tax on smokeless tobacco because it did not have a license to sell it (*id*. at ¶¶45, 50, 66).[3]  In 2011, Defendant instructed an

---

[2] Defendant directed a Springfield Warehouse employee to store the "no tax" invoices away from the Springfield Warehouse, and instructed the Berlin Warehouse's owner to destroy the "no tax" invoices (*id.* at ¶¶83, 90).

[3] Counts 12 through 16 of the superseding indictment charge Defendant with aiding and abetting trafficking in smokeless tobacco at the Springfield Warehouse in November 2009, April and December 2010, and October 2011 in violation of 18 U.S.C. § 2 and 18 U.S.C. §2342(a), which makes it unlawful for "any person knowingly to ship, transport, receive, possess, sell, distribute or purchase . . . contraband smokeless tobacco" as that is defined in 18 U.S.C. § 2341(6) & (7) (*id.* at ¶113).  "Contraband smokeless tobacco" is "a quantity in excess of 500 single-unit consumer-sized cans or packages of smokeless tobacco, or their equivalent, that are in the possession of any person other than . . . (C) a person who (i) is licensed or otherwise authorized by the State where such smokeless tobacco is found to engage in the business of selling or

employee of the Springfield Warehouse to misrepresent to a Massachusetts DOR agent that the Springfield Warehouse did not sell smokeless tobacco (*id.* at ¶99).

The Scranton Warehouse evaded the excise taxes that Massachusetts and Connecticut imposed on wholesalers of tobacco products by failing to obtain the requisite licenses from Massachusetts and Connecticut and by failing to pay the state excise taxes on the tobacco products that it shipped to the Gas Station Component (*id.* at ¶¶1, 3, 5, 51, 52).  Because the Gas Station Component did not pay state excise taxes on the smokeless tobacco and cigars that it received from the Scranton Warehouse, the Gas Station Component did not incorporate the tax cost into the prices that it charged its retail customers for these tobacco products (*id.* at ¶53).  The Gas Station Component's lower prices enabled it to capture market share of the gas station and convenience store tobacco business by undercutting the prices of competitors who included tobacco taxes in their prices (*id.* at ¶21).

Each week, the Scranton Warehouse faxed invoices to the five warehouses to inform them of the amounts they owed Defendant for their purchased tobacco (*id.* at ¶29).[4]  These entities made most payments to the Scranton Warehouse in cash because noncash payments "would create records that could lead to the detection of the illegal scheme to avoid state tobacco excise taxes" (*id.* at ¶30).[5]  Defendant, or his Scranton Warehouse employee, picked up large

---

distributing tobacco products; and (ii) has complied with the accounting, tax, and payment requirements relating to such license or authorization with respect to such smokeless tobacco." 18 U.S.C. § 2341(7)(C).

[4] Faxes from the Scranton Warehouse to the Springfield Warehouse on December 11, 2009, January 29 and October 22, 2010, and on January 21, and May 6, 2011 form the basis for Counts 2, 3, 6, 8, and 11 of the superseding indictment, which charge Defendant with wire fraud (Dkt. No. 137 at ¶111).

[5] The five warehouses made cash payments to the Scranton Warehouse in amounts that exceeded $10,000 (*id.* at ¶31).  Under 31 U.S.C. § 5331(a), any person "who is engaged in a trade or business" and who receives more than $10,000 in coins or currency in one transaction, or in two

cash payments that were generated by the Springfield, Danbury, Berlin, and Hamden Warehouses' sales of untaxed tobacco products and transported the money to Defendant's offices in Berlin and Waterbury, Connecticut and to accounts at Connecticut banks, including Defendant's attorney's IOLTA account (*id.* at ¶56).[6]  The IOLTA funds were ultimately transferred to Defendant (*id.* at 60).  Cash from the five warehouses' sales of untaxed smokeless tobacco and cigars was deposited into the Scranton Warehouse's bank accounts and, from there, it was moved to Defendant's account, and to the joint account of Defendant and a family member (*id.* at ¶¶57, 59, 60). [7]  In an effort to conceal the fact that the cash originated from tax evasion, the five warehouses' sales proceeds were also used to purchase hotels and real estate and were deposited into the bank accounts of two businesses, the Hawthorne Inn and the Litchfield on the Green Inn, which were not involved in the wholesale distribution of tobacco products (*id.* at ¶¶20, 58, 59).  The government alleges that funds from these bank accounts were further

---

or more "related transactions" during the course of the trade or business is required to file a report with the Financial Crimes Enforcement Network. 31 U.S.C. § 5331(a).  The report must include the name and address of the person from whom the cash was received, the amount received, and the date and nature of the transaction. 31 U.S.C. § 5331(b).  Defendant violated 31 U.S.C. §§ 5331 and 5332 by failing to file 8300 forms for the cash payments of more than $10,000 that the Scranton Warehouse received for sales of tobacco products to the warehouses (Dkt. No. 137 at ¶32).  The government alleges that Defendant did not report the cash payments in excess of $10,000 "to disguise the true volume of tobacco products sent from the Scranton Warehouse to the Springfield, Danbury, Berlin, Attleboro and Hamden Warehouses, and to conceal the nature, location, source, ownership, and control of the funds received by the Scranton Warehouse for tobacco product" (*id.*).

[6] The transport of a total of $25,000 from the Springfield Warehouse to Defendant's attorney's IOLTA account in West Hartford, Connecticut over three days -- March 14, 15 and 16, 2012 -- forms the basis of the money laundering charges in Counts 23, 24 and 25 of the superseding indictment, in violation of 18 U.S.C. § 1956(a)(1)(B)(i) & (ii) (*id.* at ¶116).

[7] Five transfers of cash from the Springfield Warehouse to the Scranton Warehouse's bank account in Waterbury, Connecticut on various dates between November 23, 2009 and March 7, 2011 form the basis of the money laundering charges in Counts 18 through 22 of the superseding indictment, in violation of 18 U.S.C. § 1956(a)(1)(B)(i) & (ii) (*id.*).

transferred and spent in order to "conceal the nature, location, source, ownership, and control of the funds received by the Scranton Warehouse for tobacco product[s]" (*id.* at ¶¶61, 62).[8]

IV.   <u>ANALYSIS</u>

The government argues that none of the Tobacco Funds should be released prior to trial because they are subject to forfeiture if Defendant is convicted of the charges in the superseding indictment (Dkt. No. 149).  Defendant, on the other hand, contends that there is not probable cause to believe that all of the Tobacco Funds are subject to forfeiture, and that he needs access to a portion of these assets to preserve his fundamental Sixth Amendment right to the assistance of counsel of his choice (Dkt. No. 27, 151).  The court is presented with two related queries:  (1) whether Defendant can be required to demonstrate financial need for the Tobacco Funds to retain the assistance of counsel as guaranteed by the Sixth Amendment in the face of his invocation of his Fifth Amendment right against self-incrimination; and (2) whether all of the Tobacco Funds are subject to pre-trial restraint based upon the charged RICO Act violation.  These questions will be addressed in turn.

A.   <u>Defendant's Financial Need For A Portion Of The Tobacco Funds.</u>

---

[8] On September 28, November 2, and November 17, 2010, payments of amounts each greater than $10,000 were made to a pump and tank business in Chicopee, Massachusetts by checks that were drawn on a bank account that received money from the Scranton Warehouse's bank account.  These payments form the basis for the charges of money laundering in Counts 26, 27 and 28 of the superseding indictment, in violation of 18 U.S.C. § 1957 (*id.* at ¶117).  On May 13, 2011 and January 20, 2012, payments of amounts each greater than $10,000 were made to a remodeling company of Hudson, Massachusetts by checks that were drawn on from a bank account that received funds from the Scranton Warehouse's bank account (*id.*).  These payments undergird the charges in Counts 29 and 30 of the superseding indictment, which charge money laundering in violation of 18 U.S.C. §1957 (*id.*).  Defendant is also charged in Count 17 with conspiracy to commit money laundering, in violation of 18 U.S.C. § 1956(h) (*id.* at ¶115).

This case is before this court on remand from the District Judge for a hearing on Defendant's motion for release of seized funds to determine whether Defendant can sustain his burden to show, by a preponderance of the evidence, that he needs a portion of the Tobacco Funds to secure counsel of his choice (Dkt. No. 133 at 14-15).  *See Bokhari II*, at *6; Fed. R. Crim. P. 59(a); 28 U.S.C. § 636(b)(1)(A).  The District Judge held that Defendant must provide comprehensive financial information to demonstrate his need for access to the Tobacco funds, and suggested that making that showing on an *ex parte* basis would be disfavored (Dkt. No. 133 at 11-14).  *See Bokhari II*, at *6-7.  The landscape of the case has, however, changed significantly since the District Judge issued his decision and order.  Defendant now stands indicted for conspiring to violate the RICO Act and the government seeks forfeiture of the Tobacco Funds pursuant to that law (Dkt. No. 137).  Due to the far reaching nature of the RICO laws, Defendant has invoked his Fifth Amendment privilege against self-incrimination in response to the court's directive that he produce comprehensive financial records (Dkt. No. 141).

Defendant's quest for a portion of the Tobacco Funds to retain counsel of his choice is grounded in the Sixth Amendment (Dkt. No. 27).  *See* U.S. Const. amend. VI.  A defendant's Sixth Amendment right to the assistance of counsel is "'fundamental.'"  *Luis v. United States*, 136 S.Ct. 1083, 1088 (2016) (quoting *Powell v. Alabama*, 287 U.S. 45, 68 (1932)).  Further, "the Sixth Amendment grants a defendant 'a fair opportunity to secure counsel of his own choice,'" and this aspect of Defendant's Sixth Amendment right is also "fundamental," *Luis,* 136 S.Ct. at 1089 (quoting *Powell*, 287 U.S. at 53; *Caplin & Drysdale, Chartered v. United States*, 491 U.S. 617, 624 (1989)); *see also United States v. Gonzalez-Lopez*, 548 U.S. 140, 150 (2006), although it is not absolute.  *See, e.g., Kaley v. United States*, 134 S.Ct. 1096 (2014) (sometimes a defendant will be unable to retain counsel of his choice if he cannot use forfeitable assets).

Defendant claims that this court's orders confront him with a Hobson's Choice: to make the financial showing required to gain access to a portion of the Tobacco Funds, he would have to compromise his fundamental privilege under the Fifth Amendment not to incriminate himself.

"The Fifth Amendment declares in part that 'No person . . . shall be compelled in any Criminal Case to be a witness against himself.'" *Hoffman v. United States*, 341 U.S. 479, 485-86 (1951) (quoting U.S. Const. amend. V). "This provision of the Amendment must be accorded liberal construction in favor of the right it was intended to secure." *Hoffman,* 341 U.S. at 486 (citing *Arndstein v. McCarthy*, 254 U.S. 71, 72-73 (1920); *Counselman v. Hitchcock*, 142 U.S. 547, 562 (1892)). "The privilege afforded not only extends to answers that would in themselves support a conviction under a federal criminal statute but likewise embraces those which would furnish a link in the chain of evidence needed to prosecute the claimant for a federal crime." *Hoffman*, 341 U.S. at 486. *See Kastigar v. United States*, 406 U.S. 441, 445 (1972) (the privilege "protects against any disclosures which the witness reasonably believes could be used in a criminal prosecution or could lead to other evidence that might be so used").

"To qualify for the Fifth Amendment privilege, a communication must be testimonial, incriminating, and compelled." *United States v. Hilsen*, No. 03 CR.919(RWS), 2004 WL 2284388, at *2 (S.D.N.Y. Oct. 12, 2004) (citing *United States v. Hubbell*, 530 U.S. 27, 34-38 (2000)). *See Fisher v. United States*, 425 U.S. 391, 409 (1976) (the privilege "applies only when the accused is compelled to make a *testimonial* communication that is incriminating"). The court's directive that Defendant prepare and submit comprehensive financial information has the result of requiring a communication that is compelled and testimonial. *See id*. at 410-11; *Doe v. United States*, 487 U.S. 201, 210 (1988) ("in order to be testimonial, an accused's communication must itself, explicitly or implicitly, relate a factual assertion or disclose information"). "To be

self-incriminating, evidence obtained from a defendant must (1) tend to prove the defendant's guilt of any criminal offense, and (2) be admissible as substantive evidence of guilt against the defendant." *United States v. Rechnitzer*, No. 05-CR-368, 2007 WL 676671, at *5 (N.D. N.Y. Feb. 28, 2007) (citing *United States v. Griffith*, 385 F.3d 124, 126 (2d Cir. 2004)).  In view of the broad protections that the Fifth Amendment affords and the reach of the RICO Act in terms of criminal liability, it further appears that Defendant's claim -- that his financial information could furnish a link in the chain of evidence against him -- is valid.  *See United States v. Turkette*, 452 U.S. 576, 590 (1981) (describing the RICO Act's "broad purposes"); *United States v. Adkins*, No. 1:04CR00056, 2004 WL 2237081, at *1 (W.D. Va. Oct. 5, 2004) ("The [RICO] Act states that '[t]he provisions of this title . . . shall be liberally construed to effectuate its remedial purpose'" (quoting Racketeer Influenced and Corrupt Organizations Act, Pub. L. No. 91–452, § 904(a), 84 Stat. 941, 947 (1970)).

Indeed, numerous courts have acknowledged the tension between a defendant's Fifth and Sixth Amendment rights in the related context of the requirement that a defendant disclose financial information to obtain court-appointed (CJA) counsel.  *See United States v. Salemme*, 985 F. Supp. 197, 201-203 (D. Mass. 1997) (where government sought access to defendants' CJA information, the parties before the court "disagree[d], however, about how the tension between defendants' Fifth and Sixth Amendment rights should be resolved"); *see also, e.g., United States v. Hyde*, 208 F. Supp. 2d 1052, 1057 (N.D. Cal. 2002) (where defendant was charged with mail fraud, health care fraud, and money laundering, the court concluded that his financial affidavit to obtain appointed counsel was compelled testimony that was protected by the Fifth Amendment); *United States v. Hickey*, 997 F. Supp. 1206, 1208-09 (N.D. Cal. 1998) (where defendant was charged with mail fraud, wire fraud, and securities fraud, the court denied

the government's motion to unseal financial affidavits submitted in support of a request for

appointed counsel because defendants faced a substantial risk of self-incrimination).  *Contrast*

*Hilsen*, 2004 WL 2284388 at *9-10 (where defendant was charged with unlawful failure to pay a

court-ordered child-support obligation, the court denied defendant's request to file a financial

affidavit *ex parte* and under seal because defendant failed to demonstrate that the conflict

between his Fifth and Sixth Amendment rights was "immediate and real").

"The Supreme Court has not decided whether the use of information provided to assert a

defendant's Sixth Amendment right to counsel may be used against him as substantive evidence

of guilt."  *United States v. Aguirre*, 605 F.3d 351, 357 (6th Cir. 2010) (citing *United States v.*

*Kahan*, 415 U.S. 239, 243 (1974)).  The Courts of Appeals that have addressed the issue posed

by the conflict between a defendant's Fifth and Sixth Amendment rights in the CJA context are

divided on whether a defendant's financial information should be disclosed to the government for

testing at an adversarial hearing.  *See United States v. Madrzyk*, 990 F. Supp. 1004, 1006-07

(N.D. Ill. 1998) ("In the appointment of counsel context, so as not to place defendant in the

untenable position of having to choose between his Sixth Amendment right to counsel and his

Fifth Amendment privilege against self-incrimination, circuit courts have adopted two

approaches" (citing *United States v. Sarsoun*, 834 F.2d 1358, 1363-64 (7th Cir. 1987))).  *See also*

*United States v. Gravatt,* 868 F.2d 585, 590 (3d Cir. 1989).  Some circuit courts permit access by

the government, but preclude the government from using the evidence in its case-in-chief at trial.

*See United States v. Pavelko*, 992 F.2d 32, 34 (3d Cir. 1993) (prohibiting government from using

as part of its direct case any testimony given by a defendant at a hearing where he is seeking the

assignment of counsel on the ground of his financial inability to secure counsel).  *See also*

*Aguirre,* 605 F.3d at 358; *Sarsoun*, 834 F.2d at 1364; *United States v. Harris*, 707 F.2d 653, 663

16

(2d Cir. 1983); *United States v. Peister*, 631 F.2d 658, 662 (10th Cir. 1980).  Other courts "afford

the defendant the 'opportunity to disclose the required financial information to the trial court for

it to review *in camera*, . . . [following which] the financial data should be sealed and not made

available for purpose of . . . prosecution.'"  *Gravatt*, 868 F.2d at 590 (quoting *United States v.*

*Anderson*, 567 F.2d 839, 840-41 (8th Cir. 1977)); *see also United States v. Davis*, 958 F.2d 47,

49 n.4 (4th Cir. 1992); *United States v. Ellsworth*, 547 F.2d 1096, 1097-98 (9th Cir. 1976). [9]

So far as this court has been able to determine, there are no cases that provide guidance

on reconciling the tension between the Fifth Amendment and the Sixth Amendment in the

---

[9] The case has an additional wrinkle that could implicate Defendant's Fifth Amendment privilege.  According to the government's affidavit, Defendant did not file individual income tax returns for 2012, 2013, and 2014 (Dkt. No. 144; Dkt. No. 144-2 ¶ 8).  The District Judge did not have the benefit of this information when he reviewed this court's prior decision and issued his order.  The lack of these records deprives the court and the government of a potentially powerful tool to ascertain Defendant's assets, liabilities, and sources of income.  *Compare United States v. Overstreet*, 1:11-cr-00207-BLW, 2012 WL 5969643, at *11 (D. Idaho Nov. 29, 2012) (individual income tax return reflected sources of income); R. Victor Haas, Jr., *Valuation Strategies in Divorce* §2.39 (2016) ("Carefully done analysis can be very successful in testing the accuracy of disclosed marital assets and sources of income.  By using the basic data contained on corporate and individual income tax returns, augmented by data such as industry financial ratios, personal financial statements, and loan applications, many discrepancies will be disclosed").  It is possible that the detailed financial disclosures described in the District Judge's order might "furnish a link in the chain of evidence needed to prosecute" Defendant for a separate federal crime, specifically income tax evasion. *Hoffman*, 541 U.S. at 486.  *See, e.g.,* I.R.C. § 7201 (2015) ("Any person who willfully attempts in any manner to evade or defeat any tax imposed by this title or the payment thereof shall, in addition to other penalties provided by law, be guilty of a felony and, upon conviction thereof, shall be fined not more than $100,000 ($500,000 in the case of a corporation), or imprisoned not more than 5 years, or both, together with the costs of prosecution").  *Cf.  United States v. Ponzo*, Cr. No. 97-40009-NMG, 2012 WL 28065, at *5 (D. Mass. Jan. 3, 2012) (where defendant asserted his Fifth Amendment privilege in response to the government's request for defendant's CJA affidavit to investigate whether he perjured himself, the court sealed defendant's affidavit until the underlying case concluded, at which time the government could have access to pursue its perjury investigation).

circumstances presented in this case, where Defendant would have to produce financial data to prevail in his quest for the release of seized assets to hire counsel of his choice.  This court, however, does not have to resolve the constitutional dilemma posed by Defendant's motion and his invocation of his Fifth Amendment rights, and does not believe that it should do so.

"It is bedrock that the 'long-standing principle of judicial restraint requires that courts avoid reaching constitutional questions in advance of the necessity of deciding them.'" *Sony BMG Music Ent'mt v. Tenenbaum*, 660 F.3d 487, 511 (1st Cir. 2011) (quoting *Lyng v. Nw. Indian Cemetery Protective Ass'n*, 485 U.S. 439, 445 (1988)).  There is a purely statutory basis on which to resolve Defendant's motion.  *See Buchanan v. Maine*, 469 F.3d 158, 172 (1st Cir. 2006) ("'prior to reaching any constitutional questions, federal courts must consider nonconstitutional grounds for decision'" (quoting *Gulf Oil Co. v. Bernard*, 452 U.S. 89, 99 (1981))).  It is well-settled that, regardless of Defendant's financial need, he is not entitled to release of the Tobacco Funds if there is probable cause to believe that the funds will be subject to forfeiture upon his conviction (Dkt. No. 133 at 8, 11-12).[10]  *See United States v. Farmer*, 274 F.3d 800, 805 (4th Cir. 2001); *Bokhari II*, at *4, *6; *United States v. Dupree*, No. 10-CR-627 (KAM), 2011 WL 3235624, at *1-2 (E.D. N.Y. June 2, 2011), and cases cited; 18 U.S.C. § 1963(a) & (d).  Accordingly, the court turns to the question of whether there is probable cause to believe that the Tobacco Funds will be subject to forfeiture based on the allegations in the superseding indictment.

---

[10] Unlike CJA defendants who are compelled to disclose their financial information to obtain the assistance of counsel, *see United States v. O'Neil*, 118 F.3d 65, 74 (2d Cir. 1997) (citing *Harris*, 707 F.2d at 660), Defendant has not requested court appointed counsel (Dkt. No. 27 at 8-9). Instead, he seeks a portion of the Tobacco Funds to pay for his present counsel's continued representation (Dkt. No. 27 at 8).

B.     Probable Cause For Forfeiture Of Assets Under The Superseding Indictment

1.     Standard of review

Under the superseding indictment, Defendant is now charged with conspiracy to violate

the RICO Act (Dkt. No. 137 at ¶¶1-109).  *See* 18 U.S.C. § 1962(d).  Section 1963(d)(1)(A) of the

RICO Act authorizes a court, on application of the government, to restrain a defendant's assets

pre-trial if those assets are subject to forfeiture under 18 U.S.C. § 1963(a) upon the defendant's

conviction.  *See* 18 U.S.C. § 1963(d)(1)(A).  Here, the government alleges that the Tobacco

Funds are subject to forfeiture upon conviction and they have been frozen by the court pending

trial (Dkt. No. 27 at 3; Dkt. No. 137 at 37-38).  "[A] pre-trial asset restraint [is] constitutionally

permissible whenever there is probable cause to believe that the property is forfeitable."  *Kaley*,

134 S.Ct. at 1095 (citing *United States v. Monsanto*, 491 U.S. 600, 615 (1989)).  This standard

applies even when a defendant seeks to use the restrained assets to pay for an attorney.  *Id*.  The

determination of whether the property is forfeitable "has two parts, reflecting the requirements

for forfeiture under federal law:  There must be probable cause to think (1) that the defendant has

committed an offense permitting forfeiture, and (2) that the property at issue has the requisite

connection to that crime."  *Kaley*, 134 S.Ct. at 1095.

In *Kaley*, the Supreme Court said that a grand jury indictment is sufficient to meet the

first requirement.  *Id.* at 1094, 1105.  Accordingly, here, the only question is whether there is

probable cause to believe that the Tobacco Funds have the requisite connection to the RICO

conspiracy charge to make them forfeitable under the RICO Act.  *Id*. at 1095.  "Probable cause . .

. is not a high bar:  It requires only the 'kind of "fair probability" on which "reasonable and

prudent [people,] not legal technicians, act."'"  *Id.* at 1103 (quoting *Florida v. Harris,* 133 S.Ct.

1050, 1055 (2013), quoting *Illinois v. Gates,* 462 U.S. 213, 231 (1983)).  The government does

not dispute that it bears the burden to make this showing (Dkt. No. 149 at 7-8), which is consistent with the decisions of a majority of the circuits that have placed the burden on the government at a pre-trial adversarial hearing to determine whether assets should be restrained. *See United States v. Bonventre*, 720 F.3d 126, 128, 131 (2d Cir. 2013) ("the government will bear the relatively modest burden of demonstrating probable cause to believe the assets are properly forfeitable"); *see also United States v. E-Gold, Ltd.*, 521 F.3d 411, 419 (D.C. Cir. 2008), *abrogated in part*, 134 S.Ct. 1090 (2014); *United States v. Melrose East Subdivision*, 357 F.3d 493, 503-504, 505 (5th Cir. 2004); *United States v. Jones*, 160 F.3d 641, 647 (10th Cir. 1998); *United States v. Veliotis*, 586 F. Supp. 1512, 1521 (S.D.N.Y. 1984) ("[T]he most appropriate burden to impose on the Government in this particular case is that of demonstrating probable cause to believe the defendant's property is subject to forfeiture" under the RICO Act); *but see Farmer*, 274 F.3d at 805 (hearing will provide defendant with opportunity to prove by preponderance of the evidence that government seized untainted funds without probable cause).

2. The Tobacco Funds are forfeitable under the RICO Act.

Count One of the superseding indictment charges Defendant with conspiring to violate the RICO Act, specifically 18 U.S.C. § 1962(c) (Dkt. No. 137 ¶63). *See* 18 U.S.C. § 1962(d). "Five elements must coalesce to make out a substantive RICO violation.  The government must show: '(1) an enterprise existed; (2) the enterprise participated in or its activities affected interstate commerce; (3) the defendant was employed by or was associated with the enterprise; (4) the defendant conducted or participated in the conduct of the enterprise; (5) through a pattern of racketeering activity.'" *United States v. Nascimento*, 491 F.3d 25, 31 (1st Cir. 2007) (quoting *United States v. Marino,* 277 F.3d 11, 33 (1st Cir. 2002)).  *See Salinas v. United States*, 522 U.S. 52, 62 (1997) ("The elements predominant in a [18 U.S.C. § 1962(c)] violation are: (1) the

conduct (2) of an enterprise (3) through a pattern of racketeering activity").  The statutory

definition of "racketeering activity" includes acts that are indictable under 18 U.S.C. § 2341-

2346 (trafficking in contraband cigarettes and smokeless tobacco), 18 U.S.C. § 1341 (mail

fraud); 18 U.S.C. §1343 (wire fraud), and 18 U.S.C. §§ 1956 & 1957 (money laundering) (Dkt.

No. 137 at ¶17), which are charged here (Dkt. No. 137 ¶¶111, 113, 116, 117).[11]  18 U.S.C. §

1961(1)(B).  "[A] § 1962(d) conviction [for conspiracy] requires proof of the enterprise and

racketeering elements plus . . . 'the additional element of agreement.'"  *United States v. Cauble*,

706 F.2d 1322, 1341 (5th Cir. 1983) (quoting *United States v. Phillips*, 664 F.2d 971, 1012 (5th

Cir. 1981)).

Section 1963(a) of Title 18 of the United States Code, which governs criminal forfeiture

for a RICO Act conviction, is broad.  *See United States v. Cherry*, 330 F.3d 658, 669 n.18 (4th

Cir. 2003) (the RICO statute contains what is "'by far the most far reaching' forfeiture provision,

'sweeping far more broadly' than 'the substantive RICO offense itself'") (quoting *United States v.

Voight*, 89 F.3d 1050, 1084 (3d Cir. 1996))).  The RICO forfeiture statute provides that a

defendant who violates any provision of section 1962 shall forfeit:

(1) any interest the person has acquired or maintained in violation of section 1962;

(2) any—

(A) interest in;

(B) security of;

---

[11] The statutory definition of a "'pattern of racketeering activity'" requires "at least two acts of
racketeering activity" within ten years of each other.  18 U.S.C. § 1961(5).  The allegations in the
superseding indictment establish this element for the charged offenses (*see, e.g.,* Dkt. No. 137 at
¶¶111, 113, 116, 117).

(C) claim against; or

(D) property or contractual right of any kind affording a source of influence over;

any enterprise which the person has established, operated, controlled, conducted, or participated in the conduct of, in violation of section 1962; and

(3) any property constituting, or derived from, any proceeds which the person obtained, directly or indirectly, from racketeering activity or unlawful debt collection in violation of section 1962.

18 U.S.C. § 1963(a).

The subsections of the statute distinguish between forfeiture of proceeds and forfeiture of an interest in a RICO enterprise.  *See United States v. Morrison*, 656 F. Supp. 2d 338, 344-45 (E.D.N.Y. 2009).  This distinction was articulated in *United States v. Anguilo*, 897 F.2d 1169 (1st Cir.), *cert. denied*, 498 U.S. 845 (1990):

> The types of property interests subject to forfeiture under § 1963 can be divided into two broad categories: (1) interests *in* a RICO enterprise, and (2) interests *outside* the enterprise.  Any interests *in* an enterprise, including the enterprise itself, are subject to forfeiture in their entirety, regardless of whether some portion of the enterprise is not tainted by the racketeering activity.  As the Ninth Circuit stated in *United States v. Busher*, 817 F.2d 1409 (9th Cir. 1987):  '[F]orfeiture is not limited to those assets of a RICO enterprise that are tainted by use in connection with racketeering activity, but rather extends to the convicted person's entire interest in the enterprise.'  *Id.* at 1413.
>
> The forfeiture of interests *outside* the enterprise, however, is subject to limitations.  It has been held that the forfeiture of outside interests is subject to a rule of proportionality.  *See United States v. Porcelli*, 865 F.2d 1352, 1362–65 (2d Cir.), *cert. denied*, 493 U.S. 810 (1989); *United States v. Horak*, 833 F.2d 1235, 1242–43 (7th Cir. 1987).  Such outside interests include proceeds or profits forfeitable under § 1963(a)(1), *see, e.g., Horak*, 833 F.2d at 1242–43. . . .This is in contrast to the treatment of interests in an enterprise, which are forfeitable regardless of percentage of taint.

*Anguilo*, 897 F.2d at 1211–12.  *See also Porcelli*, 865 F.2d at 1364–65 (distinguishing between a RICO enterprise which is "indivisible and is forfeitable in its entirety" and interests outside the enterprise which are forfeitable under § 1963(a)(1) only to the extent they were derived from

racketeering activity).  The difference between subsections (a)(1) and (a)(2) was further

explained in *Horak:*

> Section (a)(1) focuses on the *racketeering activity* and divests the convicted defendant of
> all interests "acquired or maintained" by that activity.  It is apparently irrelevant whether
> such interests are part of the charged enterprise.  Section (a)(2), on the other hand . . .
> focuses on the *enterprise,* not the specific racketeering activity, and divests the convicted
> defendant of all interests in the enterprise.  It would therefore seem irrelevant (at least in
> terms of the structure of the statute) whether (a)(2) interests were directly related to the
> racketeering activity of which the defendant was convicted.

*Horak*, 833 F.2d at 1243.  "As to subsection (a)(3), the statutory language, as well as the

legislative history accompanying its enactment, compels the conclusion that a nexus must exist

between the property sought to be forfeited and one or more racketeering acts."  *Morrison*, 656

F. Supp. 2d at 345.

Defendant argues, without citation to relevant authority, that the government should not

be permitted to pursue asset forfeiture through the superseding indictment (Dkt. No. 151 at 5-6).

The government, however, is not legally barred from seeking forfeiture.  In fact, forfeiture is

mandatory under the RICO Act.  *See United States v. Bangiyev*, Case No. 1:14-cr-206, 2015 WL

6672539, at *2 (E.D. Va. Oct. 28, 2015) ("The RICO forfeiture statute is mandatory" (citing

*Alexander v. United States*, 509 U.S. 544, 562 (1993))); *United States v. Bulger*, Criminal No.

99-10371-DJC, 2013 WL 6017351, at *1 (D. Mass. Nov. 13, 2013) (same).  Because the

government is required to notify a defendant through the indictment of its intent to seek

forfeiture as part of the sentence upon conviction, *see* Fed. R. Crim. P. 32.2(a), the superseding

indictment, which charges Defendant with conspiring to violate RICO, properly includes a RICO

forfeiture allegation (Dkt. No. 137).  *Compare Kaley*, 134 S.Ct. at 1095 n.5 (at issue was the pre-

trial procedure for forfeiture of assets as alleged in the superseding indictment, which charged

money laundering); *United States v. Hosseini*, 504 F. Supp. 2d 376, 378-79, 386 (N.D. Ill. 2007)

(holding that the government sustained its burden of proving certain assets were subject to forfeiture after defendant's conviction of RICO conspiracy under a superseding indictment); *Bangiyev*, 2015 WL 6672539, at *1, *11-12 (same).

Based upon the facts alleged in the superseding indictment, there is probable cause to think that the Tobacco Funds, which were obtained from the sale of the inventory of Scranton Warehouse, will be forfeitable in their entirety under three subsections of § 1963(a) if Defendant is convicted of violating the RICO Act.

a.      Forfeiture under § 1963(a)(2)(A)

The government first contends that the Tobacco Funds are forfeitable under 18 U.S.C. § 1963(a)(2)(A) (Dkt. No. 149 at 10-13).  Under this subsection of the RICO forfeiture statute, upon conviction of conspiracy to violate § 1962(c), a RICO enterprise is "indivisible and forfeitable in its entirety."  *Porcelli*, 865 F.2d at 1364.  *See Anguilo*, 897 F.2d at 1212 ("[T]he forfeiture of any interest in an enterprise . . . are 'inside' interests subject to forfeiture regardless of percentage of taint").  The RICO enterprise, itself, is "the villain, conducting its affairs through a pattern of racketeering."  *Porcelli*, 865 F.2d at 1362.  Because the allegations in the indictment, which this court must accept, establish that the Scranton Warehouse is part of the ARE, and because the Tobacco Funds are proceeds of the sale of the Scranton Warehouse's inventory, the Tobacco Funds are subject to forfeiture in their entirety under §1963(a)(2)(A). *See Busher*, 817 F.2d at 1413 ("forfeiture is not limited to those assets of a RICO enterprise that are tainted by use in connection with racketeering activity, but rather extends to the convicted person's entire interest in the enterprise"); *United States v. Walsh*, 700 F.2d 846, 857 (2d Cir. 1983) (a defendant's "entire interest in [a] RICO enterprise" is forfeitable, independent of an enterprise's degree of criminal taint); *Hosseini*, 504 F. Supp. 2d at 381 ("under Section

24

1963(a)(2) a defendant's entire interest in the RICO enterprise that served as the basis for his or her Section 1962 conviction is forfeitable, regardless of the extent to which any part of that enterprise was engaged in legitimate activity" (citing *United States v. Segal*, 495 F.3d 826, 838 (7th Cir. 2007))); *United States v. Cianci*, 218 F. Supp. 2d 232, 236 (D.R.I. 2002) ("The forfeiture provision of [18 U.S.C. § 1963](a)(2)(A) is especially severe because it makes a defendant's entire interest in an enterprise subject to forfeiture").

"The 'enterprise' is a separate element that must be proven in a RICO action." *Porcelli*, 865 F.2d at 1362 (citing *Turkette*, 452 U.S. at 583). An "enterprise includes any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(4). The grand jury returned an indictment that established probable cause to believe that Defendant conspired to violate § 1962(c) and that he owned or directed all elements of the ARE, an association-in-fact RICO enterprise, which encompassed the Scranton Warehouse, the Springfield Warehouse, the Danbury Warehouse, the Berlin Warehouse and the Gas Station Component (Dkt. No. 137 at ¶¶ 14, 15, 17-19, 23-25, 70-74, 77-79, 80, 84, 85, 88, 89, 91, 93-103, 106, 108, 109).

After Massachusetts and Connecticut levied excise tax assessments on Defendant in about 2005, Defendant moved his base of operations to the Scranton Warehouse in Pennsylvania (*id*. at ¶¶14-17). The Scranton Warehouse, which Defendant owned and controlled, became "the keystone in [Defendant's] racketeering arch" (Dkt. No. 44 at 1, Docket for Case # 3:12-cv-30167-RWZ; Dkt. No. 27 at 3). *Porcelli*, 865 F.2d at 1364. The Scranton Warehouse shipped tobacco products from Pennsylvania to the other ARE warehouses and to the Gas Station Component (Dkt. No. 137 at ¶¶14, 15, 18, 19, 26-28, 51, 52, 69, 75). Because Pennsylvania did not impose an excise tax on smokeless tobacco and cigars, the Scranton Warehouse did not

include excise tax in the prices that it charged the other ARE entities for tobacco products (*id.* at ¶17). The Scranton Warehouse's failure to report its shipments of smokeless tobacco to the Connecticut and Massachusetts tax authorities in violation of the PACT Act enabled the other ARE entities to evade state excise taxes on the smokeless tobacco that they received from the Scranton Warehouse (*id.* at ¶¶1-7, 27, 28, 34, 37, 40, 45, 50, 52, 54, 66). The Scranton Warehouse further aided tax evasion by the ARE's three other warehouses by preparing phony invoices that concealed their actual inventories of smokeless tobacco and cigars (*id.* at ¶¶1-5, 35-39, 41-44, 76). The inventory amounts on the fake invoices were used to prepare the three warehouses' Massachusetts and Connecticut excise tax returns (*id.* at ¶¶43, 44, 46-49). The ARE's gross underreporting of the warehouses' quantities of tobacco products to the tax authorities resulted in the underpayment of state excise taxes and an increase in the enterprise's profits (*id.* at ¶¶1-5, 46-49, 68, 81).

The Scranton Warehouse faxed invoices to collect payment for the tobacco products that it supplied to the other components of the ARE (*id.* at ¶29). The other warehouses paid the Scranton Warehouse in cash to conceal the actual volume of sales and the "extent of the tax underpayment" (*id.* at ¶30). To further obscure the actual sales volume and the concomitant underpayment of state taxes, Defendant transferred the cash to multiple bank accounts and unrelated businesses and used it to purchase real estate that was not connected to the wholesale distribution of smokeless tobacco and cigars (*id.* at ¶¶20, 57-62). Because the indictment's allegations establish that the Scranton Warehouse was central to the conduct of the ARE, the proceeds of the sale of its inventory -- the Tobacco Funds -- are forfeitable in their entirety under 18 U.S.C. § 1963(a)(2)(A).

Defendant argues that forfeiture under 18 U.S.C. § 1963(a)(2)(A) is not available for a conviction of conspiracy to violate RICO and cites *Cianci*, 218 F. Supp. 2d at 236, in support of his position (Dkt. No. 151 at 8-9). The holding in *Cianci* is not persuasive: it is inconsistent with the plain language of the statute and with the decisions of numerous other courts in RICO conspiracy cases. *Cianci*, 218 F. Supp. 2d at 236.[12]

"In a statutory construction case, the beginning point must be the language of the statute, and when a statute speaks with clarity to an issue, judicial inquiry into the statute's meaning, in all but the most extraordinary circumstance, is finished." *Estate of Cowart v. Nicklos Drilling Co.,* 505 U.S. 469, 474–76 (1992). "In other words, the court need not consult legislative history and other aids to statutory construction when the words of the statute neither create an ambiguity nor lead to an unreasonable interpretation." *Riva v. Massachusetts*, 61 F.3d 1003, 1007 (1st Cir. 1995). Based on the first sentence of § 1963(a) -- "[w]hoever violates *any provision* of section 1962 of this chapter . . . *shall forfeit*" -- a conviction under any subsection of § 1962 exposes a defendant to forfeiture liability under § 1963(a)(1), (2), or (3). 18 U.S.C. § 1963(a) (emphasis added). Under the plain language of the statute, which employs the word "any," a conspiracy conviction under §1962(d) is not excluded from the reach of the RICO forfeiture statute. *See Ali v. Fed. Bureau of Prisons*, 552 U.S. 214, 219 (2008) ("'Read naturally, the word "any" has an expansive meaning, that is, "one or some indiscriminately of whatever kind"'" (quoting *United States v. Gonzales,* 520 U.S. 1, 5 (1997))). This interpretation is reinforced by the far reaching purpose of § 1963. *See Busher*, 817 F.2d at 1412-13 ("Section 1963 is purposely broad. . . .

---

[12] It is notable that the government cross-appealed this ruling by the trial court, but the appeal was held in abeyance pending further briefing in light of *Blakely v. Washington*, 542 U.S. 296 (2004), and, apparently, was not resolved by the First Circuit in a later decision. *See Cianci*, 378 F.3d at 107.

Section 1963 was designed to totally separate a racketeer from the enterprise he operates" (citing *Russello v. United States,* 464 U.S. 16, 28 (1983))); *United States v. Bonanno Organized Crime Family of La Cosa Nostra*, 683 F. Supp. 1411, 1445-46 (E.D.N.Y. 1988), *aff'd*, 879 F.2d 20 (2d Cir. 1989) ("The reach of the forfeiture sanction under § 1963 has been held to be very broad, reaching a defendant's entire interest in a racketeering enterprise even if there is no proof that all of the property forfeited is tainted by criminal activity"); *see also United States v. Ginsburg*, 773 F.2d 798, 801-02 (7th Cir. 1985).

Other courts' determinations that §1963(a)(2) permits forfeiture after a conspiracy conviction under § 1962(d) further confirms this analysis.  In *United States v. Caporale,* 806 F.2d 1487 (11th Cir. 1986), *cert. denied,* 482 U.S. 917 and 483 U.S. 1021 (1987), the defendants were convicted only of conspiracy to violate RICO.  "The court rejected their argument that a conviction on conspiracy alone was insufficient to subject them to the forfeiture provision of Section 1963."  *United States v. Bloome*, 777 F. Supp. 208, 211 (E.D.N.Y. 1991).

> The language and legislative history of the statute plainly indicate that Congress intended to punish a conspiracy to violate RICO with the same tools it made available to punish substantive violations.  RICO's penalty provision, 18 U.S.C.A. § 1963(a), provides that each of the three penalties for a RICO violation, imprisonment, fines, and forfeiture, may be imposed for a violation of "any provision of section 1962."  The conspiracy provision is found in Section 1962 in subsection (d).  Furthermore, the legislative history expressly provides that "Subsection (d) [of section 1962] makes conspiracy to violate (a), (b) or (c) [of section 1962] equally subject to the sanctions of sections 1963 and 1964, below." [H.R. Rep. No. 91-1549 at 4031 (1970), as reprinted in U.S.C.C.A.N. 4007, 4033.0.]

*Caporale,* 806 F.2d at 1509.  *See also Hosseini*, 504 F. Supp. 2d at 381 (holding that, after a conspiracy conviction under §1962(d), all of defendant's interest in three car dealerships was subject to forfeiture under § 1962(a)(2)); *United States v. Saccoccia*, 823 F. Supp. 994, 1001 (D.R.I. 1993) (holding that defendants' interest in the criminal enterprise was forfeitable under § 1963(a)(2) after their conviction of RICO conspiracy), *aff'd*, 58 F.3d 754 (1st Cir. 1995);

*Bangiyev*, 2015 WL 6672539, at *6 (holding that assets of defendant's business were subject to forfeiture under §1963(a)(2) after defendant pled guilty to participating in a RICO conspiracy).

If Defendant is convicted of violating § 1962(d), Defendant's entire interest in the RICO enterprise will be subject to forfeiture under § 1963(a)(2)(A). Accordingly, because the facts alleged in the indictment establish probable cause to believe that Defendant owned and controlled the Scranton Warehouse, which was central to the charged enterprise, Defendant's whole interest in the enterprise -- including all of the Tobacco Funds from the sale of the Scranton Warehouse's inventory -- will be subject to forfeiture under § 1963(a)(2)(A) and are properly restrained pre-trial under § 1963(d).

### b.     Forfeiture under 18 U.S.C. § 1963(a)(1)

The Tobacco Funds will also be forfeitable under 18 U.S.C. § 1963(a)(1) if Defendant is convicted of violating § 1962(d). This provision demands that any defendant found guilty of violating Section 1962: "shall forfeit to the United States . . . any interest the person has acquired or maintained in violation of section 1962." 18 U.S.C. § 1963(a)(1). *See Russello*, 464 U.S. at 20-21; *Saccoccia,* 823 F. Supp. at 1002 ("The Supreme Court has held that the term 'interest,' as used in § 1963(a)(1), is not limited to a defendant's interest in the enterprise but, rather encompasses *any* interest acquired in violation of RICO"). "It is . . . apparent that the term 'interest' comprehends all forms of real and personal property, including profits and proceeds." *Russello,* 464 U.S. at 21.

> To determine what is properly forfeitable under § 1963(a)(1), courts have applied a "but for" test. Under this test, (a)(1) forfeitures are limited to property interests that would not have been acquired or maintained but for the defendant's racketeering activities. To put it another way, defendants' racketeering activities must be shown to be "a cause in fact of the acquisition or maintenance of these interests or some portion of them." This "but for" test is a proportionality rule of forfeiture. Such a rule is applied because . . . proceeds or profits constitute property interests *outside* the enterprise and thus are only forfeitable to the extent they are actually tainted by unlawful activities.

29

*Anguilo*, 897 F.2d at 1213 (citations omitted).

Defendant does not dispute that 53% of the Tobacco Funds can be directly traced to criminal activities that are alleged in the indictment, but contends that 47% is not subject to forfeiture under § 1963(a)(1) because that portion of the seized tobacco was purchased on credit and had not yet been paid for when it was seized by the government (Dkt. No. 151 at 9-11 & n.3).  On the other hand, the government claims that the entire amount is forfeitable (Dkt. No. 149 at 13-17).  The government has the better argument.

Accepting as true the allegations in the superseding indictment as supplemented by the transcript and exhibits from the July 2015 hearing, *see Kaley*, 134 S.Ct. at 1094, 1105, Defendant would not have been able to obtain tobacco products on credit but for the tainted proceeds that he obtained from the operation of the RICO enterprise.  *See Porcelli*, 865 F.2d at 1365 ("Funds derived from the operation of the RICO enterprise [are] profits obtained from racketeering activity").  The tainted proceeds were an integral part of the ARE's business cycle over a period of years.  The Scranton Warehouse obtained tobacco products from its suppliers either for cash or credit, then distributed the tobacco products to the other members of the ARE, which sold the tobacco products to their retail customers (Dkt. No. 93 at 67-73, 94; Dkt. No. 137 at ¶¶14, 15, 18, 19, 52, 53, 57, 69, 75).  The ARE engaged in racketeering activity -- specifically wire fraud, mail fraud, trafficking in contraband tobacco, and money laundering -- in order to evade state excise taxes on the majority of the cigars and smokeless tobacco that its components sold to its customers and to conceal its tax fraud scheme (Dkt No. 137 at ¶¶27-54, 67, 68, 111, 113, 115, 116, 117).  *See* 18 U.S.C. § 1961(1) (defines "racketeering activity").  Because the ARE's warehouses and the Gas Station Component did not pay excise taxes on the majority of the cigars and smokeless tobacco that they distributed, they did not include taxes in the prices that they

charged their customers for their tobacco products (Dkt. No. 137 at ¶¶17, 34, 36, 37, 39, 50, 52, 53). This tax evasion scheme enabled the ARE to undercut its competitors' prices thereby increasing the ARE's market share and profits (*id.* at ¶21). The ARE entities used their profits, which were tainted by the racketeering activity, to pay the Scranton Warehouse for the tobacco products, mostly in cash (*id.* at ¶¶30, 31, 33, 57). The Scranton Warehouse, in turn, used a portion of the tainted profits to procure additional tobacco products from suppliers either for cash or on credit, and the sequence repeated (Dkt. No. 93 at 67-73, 94; Dkt. No. 137 at ¶¶17, 57, 69). The tainted profits from the ARE that were used to pay the Scranton Warehouse's creditors enabled the Scranton Warehouse to purchase additional tobacco products on credit. *Compare Porcelli*, 865 F.2d at 1365 ("When [defendant] used his tainted profits to buy new properties, he acquired interests that were forfeitable under section 1963(a)(1)"). *Cf. United States v. Patel*, 949 F. Supp. 2d 642, 650-51 (W.D. Va. 2013) (in calculating the amount of forfeitable property based upon contraband cigarette trafficking and money laundering, the court considered the fact that proceeds of contraband cigarette sales were used to purchase more contraband cigarettes).

Accordingly, the portion of the Tobacco Funds that represented tobacco that was obtained on credit will be subject to forfeiture under § 1963(a)(1) if Defendant is convicted.

c.       Forfeiture under 18 U.S.C. § 1963(a)(3)

Section 1963(a)(3) of Title 18 of the United States Code provides another avenue for the government to obtain the Tobacco Funds through postconviction forfeiture proceedings. Proceeds that Defendant "obtained, directly or indirectly, from racketeering activity . . . in violation of section 1962" are subject to forfeiture under this subsection. 18 U.S.C. § 1963(a)(3). This provision "requires that the proceeds be traceable to 'racketeering activity.'" *Cianci*, 218 F. Supp. 2d at 237.

31

> In order to be considered "derived from" racketeering proceeds, money or property must be traceable to those proceeds in the sense that its acquisition must be attributable to the proceeds rather than to money obtained from untainted sources. However, that does not mean that the very same dollars received as proceeds must have been used to purchase the property subject to forfeiture.

*Saccoccia*, 823 F. Supp. at 1005. *See Ginsburg,* 773 F.2d at 801 (discussing § 1963(a)(1));

*United States v. Navarro–Ordas,* 770 F.2d 959, 969–70 (11th Cir. 1985) (same). "Under (a)(3),

as under (a)(1), the 'but for' test applies in determining whether the required nexus exists between

the property sought to be forfeited and the criminal activity." *Cianci*, 218 F. Supp. 2d at 237.

*See United States v. DeFries*, 129 F.3d 1293, 1313 (D.C. Cir. 1997).

"Proof that the proceeds of racketeering activity enabled a defendant to acquire the

property is sufficient to warrant forfeiture under § 1963(a)(3)." *Saccoccia*, 823 F. Supp. at 1005.

*See Horak,* 833 F.2d at 1243. Here, the government is seeking forfeiture of specific property, as

opposed to monetary profits, which can be apportioned between a business's legitimate and

illegitimate activity. *Compare Morrison*, 656 F. Supp. 2d at 346 (distinguishing between

property and a money judgment in the application of the rule of proportionality under §

1963(a)(3)). As demonstrated above in the discussion of forfeiture of the Tobacco Funds under §

1963(a)(1), the allegations in the indictment are sufficient to show that the entire amount of the

property -- the Tobacco Funds -- are traceable to proceeds of the racketeering activity. This

nexus supports forfeiture of the Tobacco Funds under § 1963(a)(3). *See* Fed. R. Crim. P.

32.2(b)(1)("If the government seeks forfeiture of specific property, the court must determine

whether the government has established the requisite nexus between the property and the

offense").[13]

---

[13] The government argues that the Tobacco Funds are also subject to forfeiture under 18 U.S.C. § 1963(a)(2)(D), which allows forfeiture of "any . . . property or contractual right of any kind affording a source of influence over any enterprise which the person has established, operated,

The government has sustained its burden of demonstrating that there is sufficient probable cause to support pre-trial restraint of the Tobacco Funds under three provisions of 18 U.S.C. § 1963(a).

IV.    Conclusion

For the reasons stated above, Defendant's motion for release of funds necessary for legal defense (Dkt. No. 27) is DENIED.  Because the court has not considered Defendant's *ex parte* financial filings, the government's motion for access to that information (Dkt. No. 145) is DENIED.

It is so ordered.

/s/ Katherine A. Robertson
KATHERINE A. ROBERTSON
United States Magistrate Judge

---

controlled, conducted, or participated in the conduct of, in violation of section 1962" (Dkt. No. 149 at 18).  18 U.S.C. §1963(a)(2)(D).  "Properties that are owned by a RICO participant and used by him to further the affairs of a RICO enterprise afford the owner/participant a source of influence over the enterprise and are thus subject to forfeiture under 18 U.S.C. § 1963(a)(2)[D]." *United States v. Zielie*, 734 F.2d 1447, 1459 (11th Cir. 1984), *abrogated on another ground by Bourjaily v. United States*, 481 U.S. 171 (1987).  *See Anguilo*, 897 F.2d at 1214.  So far as the court is aware, no other court has applied this provision to property that is comparable to the proceeds of the sale of the Scranton Tobacco.  *Compare Anguilo*, 897 F.2d at 1214-15 (café where meetings of the enterprise were held); *United States v. McKeithen*, 822 F.2d 310, 315 (2d Cir. 1987) (real property used in a continuing criminal enterprise, which has a similar forfeiture provision); *Hosseini,* 504 F. Supp. 2d at 382-383 (real estate); *Bangiyev*, 2015 WL 6672539 at *8-9 (real estate*); United States v. Rudaj*, No. 04 CR 1110 (DLC), 2006 WL 1876664, at *5 (S.D.N.Y. Jul. 5, 2006) (real property that housed a gambling operation).